[No. 21669.   Department One.   May 9, 1929.]

WILLIAMS FISHING COMPANY, *Appellant,* v. CLARK V. SAVIDGE, *as Commissioner of Public Lands, et al., Respondents.*[1]

[1] Reported in 277 Pac. 459.

166

*Welsh & Welsh,* for appellant.

*The Attorney General* and *L. B. Donley, Assistant,* for respondents.

TOLMAN, J.—Appellant instituted this action to enjoin the respondents from proceeding to lease, and from leasing, certain second-class tide lands owned by the state and situated:

". . . in front of, adjacent to or abutting upon lots 3 and 4, section 9, township 9 north, range 11 West Meridian, including Peacock Spit, lying southwesterly of the main channel range as shown upon the map of the mouth of the Columbia river prepared by the United States Engineer's Office, Second Portland, Oregon, District,"

in Pacific county, Washington.

A temporary restraining order was issued, but, upon a trial on the merits, the action was dismissed with prejudice, and the plaintiff has appealed from that judgment.

The main controversy here, and the only one we find it necessary to discuss, is waged over the location of the mouth of the Columbia river, and the question of whether the tide lands involved are a portion of the shore and beach of the Pacific ocean or of the Columbia river. If they be tide lands of the Columbia river, they are subject to lease by the state, and if they be a part of the shore and beach of the Pacific

ocean, then they are declared to be a public highway forever by chapter 110 of the Laws of 1901, p. 225. Sections 1 and 2 of that act, which are applicable here, read:

"Section 1. That the shore and beach of the Pacific ocean, including the area or space lying, abutting or fronting on said ocean and between ordinary high tide and extreme low tide (as such shore and beach now are or hereafter may be) from the Columbia river or Cape Disappointment on the south to a point three hundred feet southerly from the south line of the government jetty on Peterson's point, state of Washington on the north, be and the same are hereby declared a public highway forever, and as such highway shall remain forever open to the use of the public.

"Sec. 2. No part of said shore or beach shall ever be sold, conveyed, leased or otherwise disposed of."

■ It will be observed that the act quoted makes the southern terminus of the highway "the Columbia river or Cape Disappointment." Of course Cape Disappointment is a considerable body of land, and if the act named the cape only as the initial or starting point of the highway, there might be considerable difference of opinion as to where it would begin, but the words of the act, "from the Columbia river or Cape Disappointment on the south," would seem to indicate clearly the intention that the highway should begin at the extreme southerly point of Cape Disappointment where it is laved by the waters of the Columbia river, so that the traveler may, on leaving the waters of the Columbia, enter immediately upon the highway. No other construction, we think, will give full effect to the language used.

In 1901, when the act was passed, there would apparently have been little or no difficulty in fixing the exact spot where the highway began, but since that time many changes have taken place, though the

breakers from the ocean still roll upon the beach. At that time, according to the record, Peacock spit was only a bar, and was entirely submerged even at low tide. In 1914, the Federal government began the construction of what is known as the North Jetty, extending from a point on the shore line, at or near what is now the northerly end of Peacock spit, southwesterly into the waters of the Pacific ocean, a distance, as appears from the exhibits in this case, of fully 9,000 feet. The purpose of the building of the jetty, together with a like jetty to the south on the Oregon side, was apparently to cause the currents and tides to scour out and carry away a bar formed by the deposit of sediment at and beyond the mouth of the river, so as to provide a channel for navigation.

After the jetty was constructed, the action of the tides and currents, influenced by the jetty, caused Peacock spit to be greatly enlarged and built up, so that a large body of dry land has since appeared above high tide, extending from the jetty on the north a long distance southeasterly beyond the point or southern headland of Cape Disappointment. A large body of dry land likewise has appeared to the north of the jetty, changing the high water line so that it now extends southwesterly from a point near Dead Man's Hollow to the extreme outer end of the jetty, instead of southeasterly from Dead Man's Hollow to the point of the cape as it extended in 1901.

In general, the respondents contend that the mouth of the Columbia is now at, or a little beyond, the extreme outer end of the jetty, and that the southern end of the highway is now located at that point and there meets the waters of the Columbia river; while the appellant contends that the mouth of the river is determined by drawing a line from the extreme southern headland on Cape Disappointment to Point

Adams, the headland on the Oregon side, thus placing Peacock spit and its shore and beach in the Pacific ocean, and leaving the initial point of the highway practically where it was in 1901.

The question thus presented becomes of controlling importance in this case, because appellant, under license from the state, has fish trap locations in the deep waters off Peacock spit south of the main channel range, and necessarily uses the strip between high and low tide on the southern beach of Peacock spit in landing its fish from its traps and in transporting them by wagon to a point where they can be transferred to boats to be carried to the canneries. That the tide lands in dispute have been so used as a highway by fishermen, as well as for other legitimate purposes, for many years, is not in any way disputed.

We approach the question to be decided with great diffidence and hesitancy, because, so far as facts may be involved, the determination by the department ought not to be reviewed by the courts. *State ex rel. Smith v. Forrest,* 8 Wash. 610, 36 Pac. 686; *State ex rel. Megler v. Forrest,* 13 Wash. 268, 43 Pac. 51.

But we are convinced that here the essential and controlling facts are in no wise in dispute and the error of respondents, if they be in error, lies in having proceeded upon a fundamentally wrong basis, and is therefore an error of law and not an error of fact.

Let us inquire first what is a river. Bouvier's Law Dictionary, vol. 3, p. 2968, defines a river as follows:

"RIVER. A natural stream of water flowing betwixt banks or walls in a bed of considerable depth and width, being so called whether its current sets always one way or flows and reflows with the tide. Woolrych, Wat. 40; *State v. Gilmanton,* 14 N. H. 467.

"A body of flowing water; a running stream of no specific dimensions, larger than a brook or rivulet, and

pent on either side by walls or banks. *Board of Com'rs v. Castetter,* 7 Ind. App. 309, 33 N. E. 986, 34 N. E. 687.''

To the same effect is *Howard v. Ingersoll,* 54 U. S. 380, 14 Law Ed. 189, and 34 Cyc. 1792.

If a river is necessarily ''pent on either side by walls or banks,'' then when it ceases to be so pent in it must likewise cease to be a river. The Columbia river was not in 1901, has not since been, and is not now pent in on the northerly side by walls or banks beyond or west of the south headland of Cape Disappointment. If it be, the whole Pacific shore line to the north is a bank of the river. True, a jetty has since been built beyond that point extending, as it here appears, 9,000 feet into the sea. That is not a wall or a bank of the river, but an artificial structure maintained to assist natural forces in clearing a channel by means of which navigation can approach and enter the river.

The situation we have just pointed out would seem necessarily to be at least one of the conditions to be taken into consideration by an engineer in fixing the location of the river's mouth, and apparently the engineer of the land department ignored that condition and, though he does not say so, seems to have regarded the 9,000 feet of jetty as the natural bank of the stream.

As an aid to the solution of the question, the natural headlands on either bank of the river should be considered—at least their location would be helpful in determining where the stream ceased to be pent in by banks—the respondents' engineer seems to have given them no consideration whatever. In fact, he seems to have had in mind but one of several elements which should have been considered. He testified:

"Q. Now, explain first how the dividing point is determined between the tide lands adjacent to a river and the tide lands adjacent to the ocean? A. It is a point where the general course of the river intersects the general coast line of the ocean. Q. And how would that point be determined as a physical proposition? A. By determining on the ground or on a map the general direction of both shore lines. Q. Would that be, that is to say, would engineers necessarily agree upon the point? A. Probably no two engineers would agree on the identical point, no. Q. And then I take it the matter of determining that point between where you can say, from here on up is ocean beach and from here is river bank, is a question of judgment for an engineer to determine, is that right? A. That is right. Q. That point having been determined by an engineer, what method of division would be used between the two? A. A proportion or a split of the angle between the two lines determines the point."

But according to his testimony, given later, he did not even follow his own rule, for, in determining the general direction of the coast line, he says that he gave consideration only to the coast line north of the river, and gave no thought whatever to the general direction of the coast line south of the river.

While on the witness stand, this witness gave, as his authority for the rule which he attempted to follow, Clark on Surveying and Boundaries, which we have also consulted, and our reading leads us to fear that the witness did not have in mind all of that authority's rules. For instance, in § 261 of that work it is said:

"Not only the shape of the shore line but also the general trend of the stream must be taken into consideration."

The engineer seems to have omitted entirely from his consideration the shape of the shore line at and near the river's mouth, disregarding the decided incurve of the shore line which begins at North Head,

and what he had in mind, when he considered the general trend of the stream, we are entirely unable to determine from the record. Did he consider the river's course for the last two hundred miles, the last one hundred miles, or the last mile or two of the north channel? Each would give a different result. In fact, appellant's engineers, on rebuttal, took the rule which respondents' engineer said he used, and, by its use, arrived at results substantially the same as those they obtained from the headland to headland method, and entirely different from the results which the respondents' engineer obtained.

The evidence offered by the appellant tended to show that the Federal government had fixed the mouth of the river many years ago, had established the lighthouse at the mouth and had treated that point (the southerly point of Cape Disappointment) ever since as marking the river's mouth. The New International Encyclopaedia, vol. 4, p. 490, gives the following:

"CAPE DISAPPOINTMENT. The southwest point of the state of Washington, on the north side of the mouth of the Columbia river, in lat. 46° 16′ N., long. 124° 3′ W. It has a lighthouse with a light flashing alternately red and white (interval between flashes 15 seconds), at a height of 233 feet above sea level (Map: Washington, A3)."

The American Encyclopaedia gives similar information.

The case of *State v. State,* 211 U. S. 127, 53 Law Ed. 118, does not touch upon the location of the mouth of the river, discussing only the boundary line between the two states, but the maps published as a part of that opinion rather clearly show the main features here involved and speak eloquently in appellant's favor.

While no case is cited which exactly meets the conditions here shown, the authorities generally, so far

as they have been brought to our attention, seem to support the rule followed by appellant's engineers, and, at the same time, show clearly that respondents' engineer omitted necessary and vital elements in arriving at his conclusion.

Time and space considerations preclude an analysis of the various holdings, but, in a general sense, the following authorities lend support to appellant's position: *Wonson v. Wonson*, 14 Allen (Mass.) 71; *Malone v. Mobbs*, 102 Ark. 542, 145 S. W. 193, 146 S. W. 143; *Northern Pine Land Co. v. Bigelow*, 84 Wis. 157, 54 N. W. 496; *Deerfield v. Arms*, 17 Pick. 41; *Ball v. Slack*, 2 Whart. (Pa. St.) 508, 30 Am. Dec. 278; *Columbia Land Co. v. Van Dusen Inv. Co.*, 50 Ore. 59, 91 Pac. 469; Farnham on Waters, vol. II, p. 1463.

■ Were the question doubtful, which we think it is not, as between the solemn dedication to a public use made by the legislature nearly a generation ago and the right of the state in its proprietary capacity to use the lands for individual profit, we think the former consideration should prevail over the latter; and since the right to the free use of all public highways is one of our cherished inheritances, we have no hesitancy in holding that the highway extends along the beach of Peacock spit until it reaches the waters of the Columbia river flowing between natural banks.

■ In a companion case, where the parties are similarly situated, it has been urged that appellant's fishing locations are described by its location notices and maps as being in the waters of the Columbia river, and that it has no license or right to make locations anywhere other than in the waters of the Columbia river. We think that fact is immaterial here. No elements of estoppel are shown to exist. Appellant has the right to the use of the highway for all legitimate purposes, and if it attempts to make unlawful

use of it, or if it is fishing unauthorized locations, the state has ample power to end such activities.

The judgment is reversed, with instructions to permanently restrain the issuance of the lease in question so far as it attempts to lease any part of the shore or beach of the Pacific ocean lying between ordinary high tide and extreme low tide.

HOLCOMB, and MILLARD, JJ., concur.

BEALS, J. (concurring)—If the north jetty had never been constructed and Peacock spit had, nevertheless, arisen above the surface of the waters to the same extent and in the same place as it now exists, there could be no question but that at least the southwesterly shore and beach thereof would be a public highway pursuant to chapter 110 of the Laws of 1901, p. 225. Peacock spit would have been simply a prolongation of the shore of the Pacific ocean, added thereto by natural accretion, and the southwesterly beach of the spit would be nothing more nor less than an addition to the highway.

If, then, it be true that, had Peacock spit risen from the waters unaided by the north jetty, the beach thereof would be held to be a prolongation of the highway, it seems to me to be clear that the fact of the existence of the north jetty should not limit the application of the act of 1901. Had the jetty been constructed a mile or more north of its present location, surely it could not be contended that it would affect the status of the shore and beach south of it as to whether or not the same should be held to fall within the purview of the act of 1901, nor would it have the effect of making the ocean beach lying south of it a portion of the river shore line.

The fact that the jetty was constructed to control or affect the currents of the river is immaterial. For the

purposes of this case, it is simply an artificial construction, whether built for use as a wharf, breakwater or for any other purpose, does not concern us.

Before the jetty was built, the 1901 highway extended to the tip of Cape Disappointment; in my opinion the highway still extends to that place, and Peacock spit, lying on the ocean side of the terminus of the highway, is in the Pacific ocean, and not in the Columbia river.

While I am not prepared to hold that an artificial construction, such as the jetty, could not, under some circumstances, become a portion of a river bank and change, in fact, the actual position of the mouth of the river, I am satisfied that, under the existing circumstances as disclosed in the record now before us, the jetty has not become a portion of the bank of the river, nor has it effected any change in the location of the point where the shore line of the Pacific ocean meets the north margin of the Columbia river.

Such laws as the act of 1901, *supra*, must be liberally construed for the benefit of the public. The fact that the state may gain a considerable rental by a strict construction of the act, against the manifest purpose thereof to set aside the shore and beach of the Pacific ocean for the use of all the people forever, is immaterial in so far as the question to be determined by this court is concerned.

FULLERTON, J. (dissenting)—I am unable to concur in the conclusion reached by the majority in this cause. As appears from the title of the cause and the discussion in the majority opinion, the parties named as defendants therein are nominal parties only. The state of Washington is the real party in interest, and as its revenues are materially affected adversely by the decision, I feel justified in stating the grounds of my dissent, although I must do so at some length.

For the purposes of the particular case, it may be sufficient to say, as the majority do say, that the question for decision is whether the lands involved are tide lands of the Pacific ocean or shore lands of the Columbia river, but it must not be understood therefrom that the state is denied the power to lease its tide lands. On the contrary, the constitution and statutes of the state give the state the same power over the one class of lands as it does over the other, and it must follow that it has the same power of disposition over the one as it has over the other. Perhaps a more accurate statement of the issue involved is, has the state heretofore devoted the particular lands to a public use, and is now estopped from subjecting them to a private use.

It may aid to an understanding of the question involved if the situation is described with something more of detail than it is described in the majority opinion. Without the use of the maps introduced in evidence, which cannot well be reproduced here, it is somewhat difficult to describe the situation with clearness, but perhaps it can be made understandable by words.

Cape Disappointment is a true cape, as bodies of land of that designation are geographically known. Commencing at its northerly extremity, its shore line extends into the Pacific ocean, first in a southwesterly direction, thence southerly and southeasterly until it reaches a point where the waters of the Pacific ocean and the waters of the Columbia river commingle; it then extends in an easterly direction for some half or three quarters of a mile, thence northerly for approximately the same distance, then again westerly for a like distance, thence northerly and northeasterly until it connects with the highlands forming the north boundary of the Columbia river. Its extreme length,

northerly and southerly, is approximately four miles, and its extreme width, easterly and westerly, is approximately a mile and a half. Roughly speaking, it is in the form of an ordinary hook, with its extreme easterly projection at the point of the hook.

Turning to the legislative enactment cited and quoted in part in the majority opinion, it will be observed that it is the tide lands abutting and fronting on the ocean, not the shore lands of the Columbia river, that are dedicated as a highway. No lands that do not front or abut on the ocean are to be included therein, regardless of the question whether they are covered and uncovered by the flow and ebb of the tides. It will be observed furthermore, from the terms of the act as applied to the surroundings, that the shore line of the cape extends continuously from a place where it first projects into the ocean to a place where it enters the river, and that it forms for some distance, first the shore line of the ocean, and second the shore line of the river. From this it is at once plain that there is a place on its shore line where it can be said with certainty that the lands in its front are tide lands of the ocean, and equally plain that there is another place where it can be said with certainty that the lands in its front are shore lands of the river. But it would seem equally certain, from the very nature of the situation, that there must be a considerable space between the two places where no one can say with certainty whether the lands in its front are the one or the other. The state's engineer confessed the difficulty, and said that probably no two engineers would agree on the identical point. He made the determination, as noted in the majority opinion, by taking the general course of the shore line of the ocean and the general course of the shore line of the river and fixing the point where

the two lines met. The engineers on the part of the appellants seemingly felt the same difficulty. While they did not follow the method of the state's engineer in determining the point of division, they adopted methods equally arbitrary.

The point selected by the majority as the beginning point of the highway does not, as I understand it, coincide with any of the points of beginning selected by any of the engineers, and it seems to me to have no more reason in its support than do any of the others. It is said that:

". . . the words of the act 'from the Columbia river or Cape Disappointment on the south' would seem to indicate clearly the intention that the highway should begin at the extreme southerly point of Cape Disappointment where it is laved by the waters of the Columbia river, so that the traveler may, on leaving the waters of the Columbia, enter immediately upon the highway," and that no "other construction, we think, will give full effect to the language used."

But, to my mind, this places an undue emphasis on the phrase "on the south" used in the description. Manifestly, the phrase has no more relation to Cape Disappointment than it has to the Columbia river, and was not used to point out the place on Cape Disappointment where the highway was to begin, but was used rather to name the Columbia river or Cape Disappointment as the southerly point of the highway. It has the same relation to the southerly beginning point as the correlative words "on the north" have to the northerly termination of the highway. Hardly, I think, would the majority say that the phrase, "to a point three hundred feet southerly from the south line of the government jetty on Peterson's point . . . on the north," meant the "extreme northerly point" of the point of ending. Again, it seems to me that, to

suppose that a traveler leaving the waters of the Columbia river may enter immediately upon the highway, is to suppose an impossible situation. But, be this as it may, I think others of the reasons given show that the greater portion of the disputed land is in the Columbia river, even conceding that the majority have selected the proper beginning point. The extreme southerly point of Cape Disappointment lies a considerable distance west of the eastern extremity of the cape. Lot 4 of the government survey lies entirely east of the point, and lot 3 lies partially so. The disputed lands are in front of, adjacent to, or abutting upon these lots. If the waters of the Columbia river lave the selected point, they must, as of course, lave the shores upstream and easterly of the point, and this being so, it is at once apparent that the disputed lands lie for their greater part in the Columbia river, and it can be that the whole of them do so.

It must not be understood from what I have said that I am intending to be merely critical. I am trying to demonstrate that the point selected by the majority as the beginning point of the highway is as much arbitrary as is the point selected by the state's engineer. If I have succeeded in so demonstrating, the conclusion of the majority is clearly erroneous. Since the precise beginning point is indefinite by description, and cannot be made definite by a consideration of the natural surroundings, the point of beginning becomes a fact for the determination of the public officers having the duty to administer the law, and their conclusion upon the fact is not open to review by the courts. *State ex rel. Smith v. Forrest,* 8 Wash. 610, 36 Pac. 686, 1120; *State ex rel. Megler v. Forrest,* 13 Wash. 268, 43 Pac. 51; *State ex rel. Progressive Motion Picture Co. v. Howell,* 96 Wash. 163, 164 Pac. 917; *Diamond Drill Contracting Co. v. International Dia-*

*mond Drill Contracting Co.*, 106 Wash. 72, 179 Pac. 120.

But the majority say:

"But we are convinced that here the essential and controlling facts are in no wise in dispute and the error of respondents, if they be in error, lies in having proceeded upon a fundamentally wrong basis and is therefore an error of law and not an error of fact."

If I understand the meaning of the proposition here stated, it means that the point of beginning of the highway can be definitely determined from the description of the beginning point in the act itself, when taken into consideration with the natural surroundings. If this be what the majority mean, it would seem to end the controversy and leave no room for further discussion. But possibly I have mistaken the meaning, as the majority, after making the statement, proceed to point out the erroneous theories of the state's engineer. I shall not review this argument further than to say that I can find in the testimony of the engineer, when read as a whole and construed according to his evident meaning, none of the inconsistencies pointed out by the opinion. The criticisms indulged in seem to me to be an unjust reflection on the ability and judgment of an able and conscientious state officer. In my opinion, as I have hereinbefore attempted to demonstrate, the beginning point of the highway cannot be definitely located, whatever may be the conditions taken into consideration in determining it; that its location is a matter that calls for the exercise of a discretion; that the public officers have a primary duty to exercise this discretion; and that, when they have exercised it and made a finding on the question, that finding becomes binding upon the world, unless, of course, it is so far arbitrary and unfounded as to be beyond the pale of reason and is of itself presump-

tively fraudulent, and as to this latter, I can find nothing in its support. It may be unnecessary to add that, if the beginning point of the highway is as it is determined to be by the state's engineer, the disputed lands are not within the highway.

What I have heretofore said has been on the assumption that the beginning point of the highway is at some place off the southerly upland shore of Cape Disappointment. The state contended in the court below, and argues in this court, that this is a mistaken interpretation of the legislative enactment. With this contention, I am inclined to agree. It is founded on the physical situation presented. From the north point of the highway southerly to the northernmost projection of Cape Disappointment, the distance, so I gather from the scale maps in evidence, is between twenty-four and twenty-eight miles. The shore, for the entire distance, presents a comparatively straight line. It is free from projecting promontories and projecting indentations, and is free from the rocks and boulders not uncommonly found at such places. The tide lands are approximately a quarter of a mile wide, and their composition is such as to form, for a considerable distance out from the shore, when the tides are at ebb, a hard and smooth surface. Prior to the year 1901, when the legislature declared the tide lands to be a public highway, the beach had become a favored resort for the people of the state who were seeking rest and recreation, and, as I gather from the surroundings and the current history of the times, the purpose of the legislature was, not so much to establish a thoroughfare, as it was to preserve the beach as a recreational ground for the use of the public. The part of Cape Disappointment that fronts on the ocean presents a radically different condition. It is a rough, rocky

promontory. Its shore line is marked with numerous projections and indentations. There is no continuous body of tide lands in its front. In many places, there are no tide lands proper; the only surface covered and uncovered by the tides at all are the sides of perpendicular bluffs. Tide lands begin regularly to appear only as the mouth of the Columbia river is approached. They are built up by the debris carried down by that stream from its upper reaches. As the deposit is continuous, the area of the overflowed lands is constantly changing, and, in consequence, the lands have no value as a highway or as recreational grounds. Some parts of them have, however, great value for another purpose. The mouth of the Columbia river is one of the great salmon fisheries of the world, and certain of these places have great value as a landing place for fishing nets. The situation here presented is illustrative. Neither of the parties desires or intends to use the land in controversy as a highway is ordinarily used. The plaintiffs in the action desire to use it as a landing place for their fishing nets, and claim that they have a right to do so without hindrance or interference by any one because it is a highway. The contemplated lessees of the state desire to use it for the same purpose, contending that it is not a highway. If it is property of the state subject to lease, they are willing to pay the state $36,000 per year for its exclusive use. That this is in no sense a fictitious value, is evidenced by the fact that the public land commissioner offered the lease at competitive bidding, and that it was struck off to the contemplative lessees for the sum mentioned as the highest and best bid made therefor.

It is my opinion, because of the conditions I have recited, that the legislature never intended, by the act

in question, to include tide lands that were neither suitable for a highway nor for recreational purposes; that by the use of the ambiguous terms "the Columbia river or Cape Disappointment" in describing the beginning point of the highway, they meant to leave the place of beginning indefinite, to be determined as a more careful survey of the location than they then had before them would determine. If this be the true interpretation of the meaning of the legislative enactment, the highway begins at the northerly point of Cape Disappointment and does not reach the Columbia river. From this it would follow, as of course, that the lands in question are not within the highway. In my opinion, it is the true interpretation.

I think the judgment of the trial court should be affirmed.