[No. 21669. *En Banc.* February 4, 1930.]

WILLIAMS FISHING COMPANY, *Appellant*, v. CLARK V.
SAVIDGE *et al., Respondents.*[1]

[1]Reported in 284 Pac. 744.

*Welsh & Welsh,* for appellant.

*The Attorney General* and *L. B. Donley, Assistant,* for respondents.

ON REHEARING.

MAIN, J.—This action was brought by the plaintiff to restrain the defendant, the state commissioner of public lands, from leasing certain tide lands owned by the state and situated at or near the mouth of the Columbia river. The cause was tried to the court without a jury and resulted in a judgment dismissing the complaint, from which the plaintiff appeals.

The facts will be found fully stated in the Departmental opinion, 152 Wash. 165, 277 Pac. 459, and need not be here repeated.

After the Departmental opinion was filed, a petition for rehearing was presented and granted, and the cause was heard *En Banc.*

Sections 1 and 2 of the Laws of 1901, ch. 110, p. 225, are as follows:

"Section 1. That the shore and beach of the Pacific ocean, including the area or space lying, abutting or fronting on said ocean and between ordinary high tide and extreme low tide (as such shore and beach now are or hereafter may be) from the Columbia river or Cape Disappointment on the south to a point three hundred feet southerly from the south line of the government jetty on Peterson's Point, state of Washington on the north, be and the same are hereby declared a public highway forever, and as such highway shall remain forever open to the use of the public.

"Sec. 2. No part of said shore or beach shall ever be sold, conveyed, leased or otherwise disposed of."

It will be noticed that the southern terminus of the public highway therein provided for shall be at the Columbia river or Cape Disappointment. This cape is at the southwest point of the state of Washington

and is a body of land of some size. Its length from north to south is approximately four miles, and from east to west the extreme width is something like a mile and a half. The west shore of the cape is washed by the waters of the Pacific ocean. Against the east shore the waters of the Columbia river flow.

The pivotal point in the case is the southern terminus of the highway at the present time. The statute, as indicated, mentions, "from the Columbia river or Cape Disappointment on the south." In ascertaining this terminus, effect should be given to all the language in the act, if possible. Had the act only stated Cape Disappointment, it would have been difficult to have determined at just what point on that cape the legislature intended that the highway should begin. Having said the Columbia river or Cape Disappointment, the legislative intent is made reasonably plain. From the language used, it would seem that the southern terminus of the highway would be at a point at the southern end of the cape where the waters of the river flowing to the west would meet the shore and beach of the Pacific ocean. In the Departmental opinion, with reference to the construction of the act, it was said:

"It will be observed that the act quoted makes the southern terminus of the highway 'the Columbia river or Cape Disappointment.' Of course Cape Disappointment is a considerable body of land, and if the act named the cape only as the initial or starting point of the highway, there might be considerable difference of opinion as to where it would begin, but the words of the act, 'from the Columbia river or Cape Disappointment on the south,' would seem to indicate clearly the intention that the highway should begin at the extreme southerly point of Cape Disappointment where it is laved by the waters of the Columbia river, so that the traveler may, on leaving the waters of the Columbia, enter immediately upon the highway. No

other construction, we think, will give full effect to the language used.''

To that construction we adhere.

The question then arises, whether the southern terminus of the highway at the present time would be where the waters of the Columbia river met the shore and beach of the ocean in 1901, when the act became effective, or where they so meet at this time. It may be that, during the years that have elapsed since the passage of the act, Cape Disappointment has been added to by accretion and thus extended farther to the south, or it may be that it has been washed away by the action of the tide and the current of the river and thus shortened. There is no evidence in the case from which it can be determined where the waters of the Columbia river reach the shore and beach of the Pacific ocean at the present time. If, during the years that have elapsed, Cape Disappointment has been added to by accretion, the southern terminus of the highway would be extended to the point where the waters of the Columbia river now meet the shore and beach of the ocean. In *Hathaway v. Milwaukee,* 132 Wis. 249, 111 N. W. 570, 112 N. W. 455, 122 Am. St. 975, 9 L. R. A. (N. S.) 778, it was held that an easement granted to a city over land abutting on a navigable lake for a public street which terminated on the lake attached to accretions apportioned to the land. It was there said:

''It is also recognized that, where such shore land is subject to such an easement, it will attach to the accretion apportioned thereto. From this it must follow that such street of the city extends to the land apportioned to the strip covered by the deed, namely, the land included in the area designated on the plat as F, H, U, V; 2 Dillon on Municipal Corporations, § 634; *Banks v. Ogden,* 2 Wall. (U. S.) 57, 17 L. ed. 818.''

In 1 R. C. L., p. 243, it is said:

"As a consequence of this principle it follows that a public easement for a highway, extending to a navigable body of water, will continue to the water's edge across accretion formed along the end of the highway whether made by natural causes or the voluntary act of the owner."

■ As above stated, from the evidence in this case, the controlling fact of where the waters of the Columbia river at the present time meet the shore and beach of the Pacific ocean cannot be ascertained. All parties appear to agree that if the lands in question are on the shore and beach of the Pacific ocean they cannot be leased, but that if they are not on the shore and beach of the ocean they may be leased. The respondent attempted to prove that the lands in question were not shore and beach of the Pacific ocean by drawing a line following the general trend of the north shore of the Columbia river to the west, and then drawing a line following the general trend of the Pacific ocean and extending this line to the south until it met the line of the north shore of the Columbia river extended, and then bisecting the angle formed by these two lines. It may be admitted that, under a proper state of facts, this is a correct way to apportion tide land, but the evidence does not reach the controlling question here.

The fact of where the waters of the Columbia river meet the shore and beach of the Pacific ocean, like any other fact, may be proven by any competent, relevant and material evidence, but the evidence offered by the respondent would not necessarily establish that fact. The appellant's case in the superior court was tried on the theory that the mouth of the Columbia river was the controlling question, but the evidence offered by it does not fix the point on the north side of the river where the waters of the river meet the shore and beach of the ocean. The case upon the present record then

lacks evidence for the purpose of determining the controlling fact.

We are aware that, in the cases of *State ex rel. Smith v. Forrest,* 8 Wash. 610, 36 Pac. 686, 1120, and *State ex rel. Megler v. Forrest,* 13 Wash. 268, 43 Pac. 51, it was held that a question of fact determined by the state land commissioner was not within the province of the court to review. To that rule we adhere. It was also recognized in those cases that, if the land commissioner should make an erroneous application of the law to the facts, judicial interference would be proper. In the present case, the state land commissioner, in order to determine whether the lands in question were shore and beach of the Pacific ocean, proceeded on an incorrect view of the law. Hence the right to review by the court is available. Since neither of the parties proceeded upon a correct view of the law and both failed to offer evidence to establish the pivotal fact in the case, it seems only just that the cause should be retried in order that that fact may be determined.

The judgment will be reversed and the cause remanded with direction to the superior court to grant a new trial.

MITCHELL, C. J., BEALS, and MILLARD, JJ., concur.

TOLMAN, J. (concurring)—While I adhere to the views expressed in the Departmental opinion, yet as the facts are not clear to a majority of the court, I yield to their view that a new trial should be had.

HOLCOMB, J. (specially concurring)—I concur in the result reached in the majority opinion, but do not concur in all that is said therein.

I agree that neither side adopted the correct method of proving the matter to be determined.

However, it seems to me that the majority decision

is not explicit enough for the proper guidance of the trial court and the parties.

It is true, as was said in the prevailing opinion, that there is no case here for the apportionment of tide land. It is also correct that the southern terminus of the highway should be held to be the lands to the south of Cape Disappointment on the shore of the Columbia river and that it includes the terminal accretion thereto. It also, under this perpetual grant to the public, includes the lateral accretion as well as the terminal. The land which may have been added by accretion to the west of Cape Disappointment belongs to the shore and beach of the Pacific ocean which, by the statute, has been reserved and dedicated as ''a public highway forever . . . forever open to the use of the public.''

The inside line of that highway reserved and dedicated forever which shall never be ''sold, conveyed, leased or otherwise disposed of,'' is the line of ordinary high tide. Wherever that is, or hereafter may be, is the inner line of the highway. All lateral accretions outside it belong to the highway. But as to the shore of the river, that is the ground lying between ordinary high and low water mark (*Dalton v. Hazelet,* 182 Fed. 561, 105 C. C. A. 99). Therefore, the southern terminus to the south of Cape Disappointment is the ordinary low water mark of the Columbia river. That is established by surveying the meander line thereof, and both that meander and the line of ordinary high tide on the west side of Cape Disappointment are doubtless easily surveyed, ascertained and established.

It is unnecessary to determine the place of discharge of the main stream of the Columbia river into the ocean; for that may be, theoretically at least, far to the west of Cape Disappointment. Neither is there any

case, under our statute, for finding any angle of bisection by drawing a line following the general trend of the north shore of the Columbia river to the west, and then drawing a line following the general trend of the Pacific ocean and extending that line to the south until it meets the line of the north shore of the Columbia river extended, and then bisecting the angle formed by these two lines. The lines to be ascertained and determined are the line of the south terminus to the south of Cape Disappointment as it now is, by accretion or otherwise, and the line of ordinary high tide to the west thereof. All the shore or beach of the ocean to the west thereof is the perpetually granted public highway, and cannot be leased or otherwise disposed of.

This should be the direction and would be simple of solution, if followed.

FULLERTON, J. (dissenting)—I had the duty of participating in the hearing of this cause when it was before the Department of this court (*Williams Fishing Co. v. Savidge,* 152 Wash. 165, 277 Pac. 459), and I then reached the conclusion, contrary to the conclusion reached by the majority of the department, that the judgment of the trial court should be affirmed. The reargument of the cause before the court *En Banc* has not caused me to change my views, but, as the majority now do not follow either the views of the majority of the Department or the views I then expressed, and as I still think them in error, I am again constrained to point out why I think so.

For the purposes of illustration, I insert a diagrammatic sketch of the surroundings. It must be remembered, however, that the sketch is not drawn to scale and that it does not purport to give the actual contours of the shore lines. It is intended merely as

a visual aid to the word pictures of the situation given in the several opinions of the court. The sketch follows:

In the sketch, the line A. B. C. D. represents a part of the southern shore line of Cape Disappointment; the dotted line E. F. G. the tide and shore line abutting or fronting upon the southern shore of the cape; and the line H. I. the uplands south of the Columbia river, or the Oregon shore line of that stream. The Columbia river flows between the shore of the cape and the Oregon shore, westerly into the Pacific ocean. Since the dedication of the highway by the legislature is wholly of tide lands of the Pacific ocean where they abut or front onto the cape, and includes no part of the shore lands of the Columbia river, it is at once apparent, or at least it appears so to me, that the highway begins at the point where the river ends; the point where it can be said that the waters of the river have commingled with the waters of the ocean. If we let the line B. H. represent the place where the waters so commingle, then the highway begins at the point B and extends northwesterly and northerly from that point, and all

of the tide or shore lands lying easterly of the point are tide or shore lands of the Columbia river, and form no part of the highway.

The respondents have leased from the state all of the tide and shore lands of the river abutting upon the cape which lie easterly of its mouth, and have the right to the sole and exclusive use of such lands. In the water below these tide and shore lands are valuable salmon fishing grounds, and the use of the tide lands are of importance as a landing place for fishing nets used to enmesh the fish. The appellants fish in these waters and make use of a part of these lands as a landing place for their fish nets. The respondents have sought to exclude them from the use of the landing place, contending that the place selected is a part of the lands included within their lease. The appellants contend that the place selected is in the ocean and forms a part of the dedicated highway. These varying contentions present the issue now in controversy, and its determination depends upon the location of the dividing line between the river and the ocean. From the sketch I have presented, it might appear that the matter is of little importance. But, as I have said, the sketch is diagrammatic only. It does not represent the contours of the shore lines, and these contours make the place of all importance—it represents the difference between a valuable and a worthless fishing ground.

As noted in the several opinions of the court, the state officers located the dividing line between the river and the ocean so as to bring the place in question within the shore lands of the river. This location, it is conceded, is controlling, if the officer in making it did not "make an erroneous application of the law to the facts." But it is concluded that the officers "proceeded

on an incorrect view of the law,'' and based on this conclusion a new trial is ordered.

If I have correctly gathered the meaning of the majority, they hold that the state's officers made an erroneous application of the law because they did not take into consideration the changes that may have been made by accretions to the uplands since the highway was dedicated in 1901 and the present time. They say:

''The pivotal point in the case is the southern terminus of the highway at the present time;''

and further say:

''The question then arises, whether the southern terminus of the highway at the present time would be where the waters of the Columbia river met the shore and beach of the ocean in 1901, when the act became effective, or where they so meet at this time. It may be that, during the years that have elapsed since the passage of the act, Cape Disappointment has been added to by accretion and thus extended farther to the south, or it may be that it has been washed away by the action of the tide and the current of the river and thus shortened. There is no evidence in the case from which it can be determined where the waters of the Columbia river reach the shore and beach of the Pacific ocean at the present time. If, during the years that have elapsed, Cape Disappointment has been added to by accretion, the southern terminus of the highway would be extended to the point where the waters of the Columbia river now meet the shore and beach of the ocean.''

The foregoing means, if I understand its meaning, that the dividing line between the waters of the ocean and the waters of the river may have been changed by accretions to the tide and shore lands between the time the highway was dedicated and the present time, and may thus have caused a change in the location in the highway. With this idea, I cannot agree. As I understand it, the grant was of a specific tract of property,

as much so as it would have been had it been described by metes and bounds. In effect, the grant was of the tide lands to which the state had title; such tide lands as it acquired by the reservation made in the constitution at the time the territory of Washington was admitted into the Union as a state. The lands acquired by that reservation are in no sense ambulatory. They are fixed and determined. Under the somewhat peculiar wording of the dedicatory grant, the highway may widen by accretions thereto, but the inner shore lines and the end lines remain the same. If any part of the tide lands have become uplands by accretion since the reservation was made, the highway extends over such uplands, and if the mouth of the river has been changed thereby, that fact neither shortens nor lengthens the highway as it was fixed by the original grant.

A reference to another consideration may make this more plain. Since statehood, the state has by grant passed into private ownership much of its tide and shore lands on navigable waters under a no more definite description than the tide and shore lands in front of and abutting upon certain described uplands. If the roving theory of title adopted by the majority be correct, then much of this property is held under a very uncertain tenure. The purchaser may have acquired, at the time of his purchase, one tract of land, and now, by the action of the elements, be the owner of an entirely different tract, or he may have had a valuable property at the time of his purchase and now have nothing of which he can devote to his private use.

This was not the purpose of the constitutional reservation. It was intended to vest in the state title in fee to the tide and shore lands as they existed at the time of the reservation, and the state or its grantees owns them in fee, and the title to the specific tract is

not changed by accretions or diminutions. In this instance, the changes are made by accretions. The effect can again be illustrated by a reference to the sketch. If we assume that the dividing line between the waters of the ocean and the waters of the river at the time of the dedication is represented by the line B. H., and that the accretions are marked by the dotted line between the figures 1 and 2, then the accretions on the ocean side of the dividing line are accretions to the highway and the accretions on the river side of the line are accretions to the shore lands of the river, and neither can have the effect of shortening or lengthening the highway.

But, perhaps, the thought that the end line of the highway may have been shortened or lengthened is gathered from the Wisconsin case cited in the majority opinion. If this be so, I think the case must have been misunderstood. In that case the city of Milwaukee laid out a street within its corporate limits which terminated at one end on the waters of Lake Michigan. Afterwards there were accretions to the uplands surrounding the place where the street terminated, and the question before the court was whether the land formed by the accretions in front of the street belonged to the city, or belonged to the adjacent upland owners. The court held that the lands belonged to the city, and, while I do not question the correctness of the decision as applicable to the situation presented under the laws of Wisconsin, I do seriously question its applicability to the laws of this state. The accretion there was longitudinal; it extended the length of the street, while here the accretions are lateral, and their utmost effect is to widen the highway and the shore lands.

In the second place, the principle applied by the court is not applicable to our situation. In this state,

as we have repeatedly held, the title of an owner of lands bordering on navigable waters terminates at ordinary highwater mark. He has no riparian or littoral rights in such waters. All the tide and shore lands below that line are vested in the state. As I have said, the state owns the property in fee, and no change in the situation, either by accretions or by diminutions affects its title. So, were the situation presented in the Wisconsin case presented to this court, we would hold, if we followed our prior holdings, that the accretions to the lake front belonged neither to the upland owners nor to the city, but to the state.

The foregoing considerations lead me to think that the conclusions adopted by the majority are utterly wrong in principle. But if they are adopted as the correct solution of the question involved, I still think there is no need for a new trial. The Columbia river is one of the great rivers of the world. It drains a vast area. Like all such rivers, its current carries down from its upper reaches immense quantities of silt and other forms of debris which it deposits at its mouth. The tendency of the deposit is, of course, to lengthen the river and to gradually extend its mouth further into the Pacific ocean. But this process is slow. Historically, we know that, since the stream has been known by civilized man, there has been no considerable change in this respect. Since 1901, there can have been no perceptible change, and I cannot conceive of any possible evidence that can be produced which will throw more light on the question than we now have, and a trial can be nothing more than a useless procedure.

In my dissent to the department opinion, I pointed out the reasons why a determination of the dividing line between the waters of the ocean and the waters of the river must be more or less arbitrary, and I need not restate the reasons here. I pointed out further

that the determination of the line primarily devolved upon the state, and that its determination is binding upon the courts unless it is so far arbitrary as to be beyond the pale of reason, or was made under a mistaken theory of the law. That the officer acting for and on behalf of the state in making the determination acted in the utmost good faith, the record, as I view it, leaves no room to doubt. That he acted on an incorrect view of the law, I am, for the reasons stated, not persuaded, and in my opinion the judgment of the trial court should be affirmed.

PARKER, J. (dissenting)—I concur in the conclusion reached by Judge Fullerton, particularly on the ground stated in the last paragraph of his dissent.

FRENCH, J., concurs with PARKER, J.