77 P.3d 671 (2003)
R. Terrance LARSON and Vicki A. Larson, Husband and Wife, Appellants,
v.
Stephen R. NELSON and Kathleen Ann Nelson, Respondents.
No. 28464-2-II.
Court of Appeals of Washington, Division 2.
October 14, 2003.
*672 David L. Edwards, Edwards & Hagen, PS, Aberdeen, WA, for Respondent.
David Claude Tingstad, Attorney at Law, Edmonds, WA, for Appellant.
HUNT, C.J.
R. Terrance and Vicki Larson appeal the trial court's grant of summary judgment to Stephen R. and Kathleen Ann Nelson in the Nelsons' contempt action against the Larsons for violating an order quieting the Nelsons' title in two of the Nelsons' lots along Kindred Slough in Pacific County. The Larsons argue that there are issues of fact as to (1) whether Kindred Slough is a navigable "river"; and (2) correspondingly, whether the line of ordinary high tide should set Nelsons' boundary, not the meander line advanced by the Nelsons. We agree with the Larsons, reverse the summary judgment, and remand *673 for trial on the factual issues pertaining to whether Kindred Slough is a "river."

FACTS

I. BACKGROUND
Vicki Larson and Stephen Nelson are siblings. Their parents have conveyed to them various real estate in Pacific County. The lots at issue here border the Kindred Slough in Tokeland, Washington. At its eastern-most point, Kindred Slough flows into Willapa Bay.
Stephen Nelson and his wife, Kathleen Nelson, own Government Lots 4 and 5, Section 12, Township 14 North, Range 11 West, W.M. Kindred Slough runs north-northeast of their property. Vicki Larson and her husband, Terry Larson, own the uplands along the northern shore of Kindred Slough. The Nelson and Larson properties are connected by a dike across Kindred Slough, with gates near both ends. See the diagram below:

Vicki Larson asserts that (1) her parents granted her all tidelands of Kindred Slough; and (2) Stephen Nelson took Lots 4 and 5 only up to the mean high-water mark (not to the meander line, as he asserts).[1] IN SUPPORT OF HER claim, she has a 1997 statutory warranty deed that purports to grant her all second-class tidelands "in front of, adjacent to or abutting upon" Lots 4 and 5. We previously affirmed a trial court order quieting the Nelsons' title to Lots 4 and 5[2] and ordering that the Larsons are "forever barred from having or asserting any right, *674 title, estate, lien, easement or interest in the property, excepting the easement of record across Lot 5."[3] See Supplemental Clerk's Papers (SCP) (5/17/03) at 3. This previous case, however, did not delineate the seaward boundaries of Lots 4 and 5 or address ownership of the adjacent tidelands.

II. SUMMARY JUDGMENT
The Nelsons brought an action for contempt, alleging that the Larsons had told prospective purchasers of the Nelson property that (1) the Nelsons do not own all of the property being sold; and (2) the Nelsons had routinely used and trespassed on the property. The Larsons responded by asserting ownership of the tidelands adjacent to Lots 4 and 5 under the 1997 deed from Vicki Larson and Stephen Nelson's parents.
The Nelsons moved for summary judgment and dismissal of the Larsons' ownership defense. They argued that the Larsons' 1997 deed could not have transferred ownership of the tidelands because the Nelsons already owned Lots 4 and 5, originally transferred by federal patent, out to the meander line of Kindred Slough, which is "navigable water." The Nelsons supported this motion with declarations from Bruce Walker, showing the chain of title, and Karl Ferrier, who had surveyed the meander line between Lots 4 and 5 and Kindred Slough.
The Larsons agreed that Kindred Slough is navigable, but they claim that the slough is a "river," which sets the Nelsons' boundary line at the ordinary high-water mark.[4] The Larsons supported this position primarily with the Declaration of Earl Azeltine, a surveyor, who opined that Kindred Slough is a "river" because:
1) by definition, a slough is an arm of a river; 2) the tide ebbs and flows over it; 3) it is a channel or tributary of the Cedar River; 4) fresh water continues to flow from it into Willapa Bay, even when the tide is out; and 5) it is confined by two immediately adjacent banks.
Clerk's Papers (CP) at 39.[5]
The Nelsons moved to strike Earl Azeltine's declaration[6] and submitted a second declaration from Ferrier. After analyzing numerous government surveys and charts, Ferrier disagreed with Earl Azeltine's characterization of the slough as a river. In support, he asserted the following facts: Kindred Slough (1) does not have "a channel or headwaters"; (2) has no "hydrological connection with the `Cedar River', or any of its tributaries"; and (3) is merely a part of Willapa Bay that is, "a bare area at low water." CP at 56-67.
The trial court granted summary judgment to the Nelsons and entered a written order. The Larsons moved for reconsideration and submitted three declarations supporting their claim that Kindred Slough is a navigable river. The trial court denied the motion and entered a memorandum opinion. It did not, however, enter a written order at that time. The trial court later entered a formal order denying the motion for reconsideration, after the instant appeal was filed.

*675 III. SECOND APPEAL
The Larsons appealed. The Nelsons moved to dismiss, arguing that "RAP 2.2(a) does not permit an appeal to be taken from summary judgment rulings," which here, merely dismissed a defense that the Larsons had raised in the contempt action, still pending in the court below.
A commissioner of our court denied the Nelsons' motion to dismiss, reasoning that the "order granting summary judgment is appealable" under RAP 2.2(a)(1).

ANALYSIS

I. APPEALABILITY
The Nelsons first argue that the Larsons' notice of appeal is defective because the trial court did not enter an order denying the Larsons' motion for reconsideration. That order has since been entered and made part of the record on appeal. Thus, this issue is moot.

II. ISSUES OF MATERIAL FACTIS KINDRED SLOUGH A "NAVIGABLE RIVER"?

A. Standard of Review
Summary judgment is appropriate "if the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). After the moving party has produced evidence showing that no factual dispute exists that might affect a trial's outcome, the burden shifts to the nonmoving party to set forth facts showing that there is a genuine issue of material fact. Greater Harbor 2000 v. City of Seattle, 132 Wash.2d 267, 279, 937 P.2d 1082 (1997). We view all facts and reasonable inferences in the light most favorable to the nonmoving party, granting summary judgment only if reasonable minds can reach but one conclusion. Greater Harbor, 132 Wash.2d at 279, 937 P.2d 1082.
The central issue here is the location of the seaward boundary between the Nelsons' Lots 4 and 5 and the Kindred Slough tidelands. The boundary may be determined as a matter of law only after the underlying, disputed, fact-based characteristics of the slough are resolvednamely, whether Kindred Slough is a "navigable river" or some other form of "navigable water." There is no dispute that Kindred Slough is navigable.[7]
The Larsons contend that there are genuine issues of material fact precluding summary judgment on the question of whether Kindred Slough is a "river." The Nelsons counter that the slough is not a river as a matter of law. We agree with the Larsons.

B. Property Line between Land and Navigable Water
The State of Washington has generally asserted "ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide... within the banks of all navigable rivers." WASH. CONST. art. XVII, § 1. Thus, a landowner's water boundary generally extends to the ordinary high-water line.[8]
But Washington has disclaimed "all title in and claim to all tide, swamp and overflowed lands, patented by the United *676 States." WASH. CONST. ART. XVII, § 2. Consequently, there is a well-recognized exception for federal-government-patented lots with meander lines running below the ordinary high-water mark.[9] In such cases, "a land patent conveys to the patentee title to all of the property above the line of ordinary high tide or the government meander line, whichever is farther seaward." Stockwell v. Gibbons, 58 Wash.2d 391, 393-94, 363 P.2d 111 (1961) (citing Van Siclen v. Muir, 46 Wash. 38, 89 P. 188 (1907); Kneeland v. Korter, 40 Wash. 359, 82 P. 608 (1905)).
This exception, however, has been limited to "patented lands bordering the Puget Sound, bays, lakes, or waters treated as a bay." Smith Tug & Barge Co. v. Columbia-Pacific Towing Corp., 78 Wash.2d 975, 979, 482 P.2d 769 (1971) (footnotes omitted). The exception does not apply to rivers. As our Supreme Court has explained, "[T]he line of ordinary high water is the boundary of federal lands patented prior to statehood, if they abut navigable rivers." Smith Tug & Barge, 78 Wash.2d at 983, 482 P.2d 769 (emphasis added).
Here, Lots 4 and 5, which abut Kindred Slough, were originally transferred by a federal patent before statehood. Thus, there are two possible boundary lines,[10] depending on whether Kindred Slough is a river: (1) If Kindred Slough is a navigable river, the boundary is the line of ordinary high water, see Smith Tug & Barge, 78 Wash.2d at 983, 482 P.2d 769; or (2) if Kindred Slough is navigable water but not a river, the boundary is either the ordinary high-water line or the meander line, whichever is farther; here it appears that the meander line is farther. See Stockwell, 58 Wash.2d at 393-94, 363 P.2d 111.

1. "River"
Under Washington's common law of property, a "river" is generally:
A natural stream of water flowing betwixt banks or walls in a bed of considerable depth and width, being so called whether its current sets always one way or flows and reflows with the tide.
A body of flowing water; a running stream of no specific dimensions, larger than a brook or rivulet, and pent on either side by walls or banks.[11]
Webster's Third New International Dictionary echoes this definition of a "river" as "a natural surface stream of water of considerable volume and permanent or seasonal flow." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1962 (1966). Under federal law, a "river" usually has "two opposing `headlands' marking and constituting the mouth" of the river.[12]
A river or stream also flows in a "reasonably definite channel" that has a bed and banks. De Ruwe v. Morrison, 28 Wash.2d 797, 812, 184 P.2d 273 (1947). According to the Ninth Circuit, (1) a river's "bed" is "a definite and commonly a permanent channel"; (2) a river's "banks" are "the elevations of land which confine the waters to their natural channel when they rise to the highest point"; and (3) a river's "channel" is "the passageway between the banks through which the water of the stream flows."[13]
*677 Our Supreme Court has explained why the ordinary high-water line (rather than the meander line used for other water bodies) should set the boundary on federally patented lands bordering "rivers," citing two distinct attributes of "rivers":
Whereas the shores of navigable lakes, bays and the Puget Sound are subjected to some accretion and erosion, it is the very nature of rivers to shift and change their banks. Furthermore, rules of law which logically apply to the single bank and open shores of an ocean, sound or navigable bays and lakes, wherein the rights of the landowners on opposite shores seldom conflict, are completely irreconcilable with problems faced by owners of land bounded by navigable rivers. Rivers are confined to two immediately adjacent banks both of which are subject to constant change by accretion and erosion.
Smith Tug & Barge, 78 Wash.2d at 982, 482 P.2d 769 (some emphasis added).
From these cases we glean the following characteristics of a "river": (1) a natural water body; (2) in a bed of considerable size with a reasonably definite channel; (3) that flows or runs in some direction at least seasonally; (4) between two banks that are subject to more accretion and erosion than do the banks of lakes or bays; (5) typically with opposing headlands marking the mouth.
At the summary judgment reconsideration hearing, the Larsons submitted, and the trial court considered, an additional report prepared by Dr. Vladimir Shepsis, a coastal hydraulic civil engineer with extensive international experience and expertise in river, coastal, and oceanographic engineering, with nearly two-dozen publications. Dr. Shepsis has past professional experience with Willapa Bay and its surrounding waters. In direct contrast to Ferrier, Dr. Shepsis concluded that Kindred Slough is a river because (1) it has a substantial mean annual water flow, according to statistical measurements; (2) it has "migrated over time"; and (3) its banks' topographies "have changed substantially over time."[14] Dr. Shepsis also identified his estimated location of the channel line along Kindred Slough's bed.
The Larsons assert that they raised genuine issues of material fact below about whether Kindred Slough is a "river" by presenting (1) aerial photos showing a "clearly defined channel"; (2) expert testimony that its mean annual water flow exceeds that of other rivers; and (3) expert opinions from Dr. Vladimir Shepsis, Earl Azeltine, and Steve Azeltine, concluding that Kindred Slough is a "river." The Nelsons counter that the declarations of Dr. Shepsis and Sonny Johnson, which the Larsons submitted with their motion for reconsideration, are not properly before this court, and the remaining evidence is conclusory, irrelevant, and insufficient to raise a genuine issue of material fact. We disagree. Moreover, the trial court considered these declarations in denying the Larsons' motion for reconsideration. Accordingly, we, too, consider them.

2. "Slough"
The parties also dispute whether there was evidence presented below showing a "reasonably definite channel," at least before presentation of Dr. Shepsis' and others' declarations. The Nelsons argued below that government surveys show that Kindred Slough's shorelines have remained "essentially the same" for the past 143 years.[15] The Larsons countered that the evidence shows a reasonably definite channel. These factors, however, are not conclusive as to whether Kindred Slough is a river because definite channels and stable shorelines characterize other types of water bodies as well.
Furthermore, mere use of the word "slough" in the name "Kindred Slough" does not make it an "arm of a river" by definition. Generally, a "slough" has two legal meanings: (1) an "arm of a river, separate from the main channel" (here pronounced "sloo"); or (2) "A bog; a place filled with deep mud" (here pronounced "slow"). BLACK'S LAW DICTIONARY 1394 (7th ed.1999). Washington *678 courts have used both meanings of the word.[16]
The Larsons assert that Kindred Slough is part of the Cedar River; they support this assertion with the declarations of Earl Azeltine and Steve Azeltine. The Nelsons, on the other hand, submitted hydrological evidence suggesting that Kindred Slough is connected only to Willapa Bay, not to the Cedar River: In a color-coded 1957 government geological survey, Kindred Slough is colored "pink," the same color as the Bay's tidelands; in contrast, the Cedar River and other rivers are colored blue. The Nelsons' expert, Ferrier, indicated that four other government charts and surveys fail to indicate a relation between the Cedar River and Kindred Slough.
This competing, apparently competent evidence demonstrates the need for a trial to resolve these factual issues.[17]

III. THE LARSONS' TITLE
The Nelsons argue for the first time on appeal that the Larsons' 1997 deed is defective. Because they did not raise this issue below, we have no trial court decision before us to review and we do not address it.
Accordingly, we reverse summary judgment and remand for trial.
We concur: SEINFELD and HOUGHTON, JJ.
NOTES
[1] As applied to tidal waters, "ordinary high[-]water[]mark" is generally defined as "the line of mean high tide determined as nearly as possible by calculating the average height of all high tides at that location over the ... tidal cycle." Wilson v. Howard, 5 Wash.App. 169, 180, 486 P.2d 1172, review denied, 79 Wash.2d 1011 (1971). In contrast, "meander lines" are the "waterside boundaries of government lots" consisting of "a series of short, straight lines which approximate the curved edge of a body of water." Thomas v. Nelson, 35 Wash.App. 868, 870, 670 P.2d 682 (1983). The term is used interchangeably with the terms "line of ordinary high tide" and "mean high-water mark."
[2] This quiet title action addressed only the easement across Lots 4 and 5; it did not address ownership of the adjacent tidelands. The order quieting title in "Lots 4 and 5" did not delineate the seaward boundaries of Lots 4 and 5.
[3] See Larson v. Nelson, 105 Wash.App. 1056, 2001 WL 254650, review denied, 144 Wash.2d 1014, 31 P.3d 1185 (2001) (Houghton, J., Bridgewater, J., Alexander, J.) (unpublished opinion rejecting the Larsons' argument that an implied easement ran along the most direct path on Nelson's property to the Larson's express easement thereon). The easement litigated in the prior appeal is not at issue here.
[4] As noted in the facts section of this opinion, the Larson and Nelson properties are connected by a dike with gates at both ends. The southerly tide and the meander line of Lot 5. Therefore, determining which of the two is the boundary of Lots 4 and 5 is crucial to this case, not only because it establishes who owns the tidelands, but also who controls the southerly tide gate.
[5] Terry Larson also submitted a declaration (1) asserting ownership of the property; (2) arguing that the dike served the ranch property he had acquired, attaching a service agreement with Weyerhauser to maintain the dike; and (3) attaching an photocopy of an aerial picture of the dike at the time of construction (now essentially of useless visual quality).
[6] After the Nelsons revealed that Earl Azeltine lost his surveyor's license for multiple acts of incompetence, the Larsons submitted an essentially identical declaration from Azeltine's son, Steve, a licensed surveyor who employed Earl Azeltine. The trial court denied the Nelsons' motion to strike.
[7] The Larsons assign error to the trial court's ruling that "Kindred Slough is not navigable," and argue extensively that it is navigable, (noting use in commercial navigation and similarity to sloughs found to be "navigable"). The Nelsons do not dispute that Kindred Slough is navigable. Rather, they argue that because Kindred Slough is navigable water, the meander line is the boundary.

Furthermore, the trial court essentially ruled that Kindred Slough was navigable when it set the meander line as the seaward boundary, which rule applies to navigable waters. Stockwell v. Gibbons, 58 Wash.2d 391, 393-94, 363 P.2d 111 (1961). Accordingly, navigability of Kindred Slough is not an issue in this appeal. Rather the central issue is whether Kindred Slough is a "river" for boundary line purposes.
[8] Borax Consol. v. City of Los Angeles, 296 U.S. 10, 22-23, 56 S.Ct. 23, 80 L.Ed. 9 (1935); Kemp v. Putnam, 47 Wash.2d 530, 534-35, 288 P.2d 837 (1955) overruled on other grounds by Save a Valuable Env't. v. City of Bothell, 89 Wash.2d 862, 576 P.2d 401 (1978) (navigable river). See generally 18 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE, REAL ESTATE: TRANSACTIONS, § 12.5, at 68 (1995) (line of "mean high tide" is boundary for "tidal waters," line of "ordinary seasonal high water" for "navigable fresh water lakes and streams").
[9] See, e.g., Brace & Hergert Mill Co. v. State, 49 Wash. 326, 331-32, 95 P. 278 (1908); Scurry v. Jones, 4 Wash. 468, 469-70, 30 P. 726 (1892).
[10] Because the parties agree that Kindred Slough is navigable, we do not address a third possibilitythat the boundary is the "thread" or deepest point in the main channel. See Island County v. Dillingham Dev. Co., 99 Wash.2d 215, 223, 662 P.2d 32 (1983).
[11] Williams Fishing Co. v. Savidge, 152 Wash. 165, 169-70, 277 P. 459 (1929) (internal quotation marks and citations omitted), modified on other grounds and remanded, 155 Wash. 443, 284 P. 744 (1930) (en banc). See also Williams Fishing Co. v. Savidge, 164 Wash. 50, 54, 2 P.2d 722 (1931) (approving trial court's use of the first definition above).
[12] Georgia v. S. Carolina, 497 U.S. 376, 399, 110 S.Ct. 2903, 111 L.Ed.2d 309 (1990) (citing Knight v. United States Land Assn., 142 U.S. 161, 207, 12 S.Ct. 258, 35 L.Ed. 974 (1891)).
[13] Yellowstone Pipe Line Co. v. Kuczynski, 283 F.2d 415, 421 (9th Cir.1960) (citing 2 HENRY P. FARNHAM, THE LAW OF WATERS AND WATER RIGHTS; INTERNATIONAL, NATIONAL, STATE, MUNICIPAL, AND INDIVIDUAL, INCLUDING IRRIGATION, DRAINAGE, AND MUNICIPAL WATER SUPPLY 1462 (1904); see also Maricopa County Mun. Water Conservation Dist. No. 1 v. S.W. Cotton Co., 4 P.2d 369, 39 Ariz. 65 (1931); Morton v. Oregon Short Line Ry. Co., 87 P. 151, 48 Or. 444, (1906)).
[14] In reaching these conclusions, he studied five aerial photographs from the years 1938, 1945, 1949, 1975, and 1999.
[15] The Nelsons' several charts and surveys locate Kindred Slough at a fixed location, between Lots 4 and 5 and Kindred Island.
[16] Cf. State v. Superior Court of Okanogan County, 119 Wash. 372, 372, 205 P. 1046 (1922) (observing "a slough or arm connecting two rivers") and Hedlund v. White, 67 Wash.App. 409, 411, 836 P.2d 250 (1992) ("slough of the river") with Hardman v. Younkers, 15 Wash.2d 483, 486, 131 P.2d 177 (1942) ("slough, or swamp"); Pays v. Roseburg, 123 Wash. 82, 211 P. 750 (1923) ("slough or swamp").
[17] The summary judgment court concluded that (1) "[t]he property in question has a reasonably fixed bank and is best described as tide, swamp and overflowed lands," CP at 86; and (2) "the morphological changes detailed here do not give rise to the anomalies that trigger the navigable river exception." CP at 197-98. But the court also acknowledged that Dr. Shepsis' declaration showed (1) changes in the Kindred Slough channel centerline, (2) changes in the shorelines of Kindred Slough, and (3) water flow sufficient to support navigation.

Because weighing of evidence, balancing of competing experts' credibility, and resolution of conflicting material facts are not appropriate on summary judgment, a trial is necessary to resolve these matters.