[No. 2788–2. Division Two. January 17, 1979.]

RONALD ERICKSON, ET AL, *Respondents,* v. PAUL M. WICK, ET AL, *Appellants.*

*Mann, King, Anderson, Bingham & Scraggin* and *David J. Manger,* for appellants.

*Bonneville, Viert & Morton* and *David McGoldrick,* for respondents.

SOULE, J.—Paul M. Wick and Ethel ·Marion Wick, together with their son Bryan D. Wick, own a portion of a certain government lot 5. They appeal from a judgment which quiets title to a small parcel of land on the shore of Crescent Lake in Ronald and Lydia E. Erickson, husband and wife, and Talmo, Inc., a Washington corporation, who own a portion of the adjoining lot 6. We affirm the judgment.

The property in dispute lies in section 16, township 22 north, range 2 east of the Willamette Meridian in Pierce County. Physically, it lies on the shore of Crescent Lake. The primary issue is whether it is a part of government lot 6. If it is properly a part of lot 6, secondary issues arise because of the Wicks' claim of title by adverse possession under claim and color of title and payment of taxes under RCW 7.28.070 and claim of title under color of title to vacant and unoccupied land under RCW 7.28.080.

The problem has been created because the official plat produced by the surveyor general in 1857 from the field notes of the original government survey may not accurately reflect the location of the meander line of Crescent Lake. The following sketch portrays the relationship of the government lots 5 and 6 to Crescent Lake as shown by plaintiffs' exhibit 4 and defendants' exhibit C. Both are versions of the official plat. They differ in some details but the essential configurations are the same.

As shown on the plat, the meander line of the lake touches the north–south line between lots 5 and 6 in such a manner that a triangular area of approximately 6 acres abutting on the west of a 40–acre parcel, which would otherwise be a regular government quarter quarter section, is designated in its entirety as lot 6, thereby giving rise to

the designated acreage of 46. To lot 5 is attributed 13.00 acres or 13.5 acres, depending upon the interpretation of the entry on exhibits 4 and C which appears as "A 135"[1]

This lawsuit arose because if *currently* accepted surveying techniques and *currently* accepted points of reference are used and considered with the original field notes of the government's original surveyor the meander line does not come closer than 51 feet to the north–south line. Thus a discrepancy exists between the meander line as depicted on the government plat and as it now would be located by surveyors. Lot 5 fails to close on its southern side if current survey techniques and currently accepted points of reference prevail over the government plat. Moreover, the situation is complicated by the normal legal principle that reference to a meander line carries the true boundary to the actual water's edge because the meander line itself is not normally intended as the boundary for upland tracts. *Harris v. Swart Mortgage Co.,* 41 Wn.2d 354, 249 P.2d 403 (1952); *Hirt v. Entus,* 37 Wn.2d 418, 224 P.2d 620 (1950); and *Thein v. Burrows,* 13 Wn. App. 761, 537 P.2d 1064 (1975). In *Mitchell v. Smale,* 140 U.S. 406, 413, 35 L. Ed. 442, 445, 11 S. Ct. 819 (1891), the court said:

The official plat made from such survey does not show the meander line, but shows the general form of the lake

---

[1]The government plat does not contain a clear designation for lot 5. Defendant's surveyor, Johnson, testifying with respect to exhibit C said that the circle around the numeral 5 was intended as the lot designation and that the area was shown as 13 acres.

436

deduced therefrom, and the surrounding fractional lots adjoining and bordering on the same. The patents when issued refer to this plat for identification of the lots conveyed, and are equivalent to and have the legal effect of a declaration that they extend to and are bounded by the lake or stream.

■■ However, where, as here, there is a variance between the plat and the field notes, and the land has been conveyed out of the government's title by reference to the plat, the plat controls. *Sala v. Crane,* 31 Idaho 191, 170 P. 92 (1918); *Gary Land Co. v. Griesel,* 179 Ind. 204, 100 N.E. 673 (1913); *Beaty v. Robertson,* 130 Ind. 589, 30 N.E. 706 (1892); *Hanson v. Rice,* 88 Minn. 273, 92 N.W. 982 (1903). Further, a meander line may act as the true boundary provided the parties to the conveyance so intended. *Harris v. Swart Mortgage Co., supra.* Thus, the fundamental question is, what was the government's intention in making the original grants of lots 5 and 6? When ascertained, that intent will control even if it results in a variance from the preferred rectangular method of platting. *Baackes v. Blair,* 223 Wis. 83, 269 N.W. 650 (1936).

The testimony establishes that lot 6 would not have existed as such had the personnel in the surveyor general's office not supposed that the meander line representing the lake shore encroached upon the north–south line representing lot 5's easterly border and lot 6's westerly border. The surveying and platting officials necessarily realized that the lake shore itself perhaps did not touch the north–south boundary line bordering lot 5 on the east because meander lines usually run some distance inland from the water's edge. Thus, for the purpose of that plat, it is clear that they intended to close lot 5 at the point where the meander line *as platted* struck the north–south line between lots 5 and 6; and thus arose the exceptional circumstance justifying the use of the meander line, if not as a boundary, at least as a means of fixing the point on the north–south line which

would close lot 5.[2]

Having ascertained the intent of the original platters, the next problem is to find that point on the north–south line which most nearly approximates the point intended by the original platters as the point of closure for lot 5. This was done by the witness Thornton by reestablishing the meander line according to the best available modern techniques and, from the point where the meander line most closely approaches the north–south line, drawing a perpendicular to the north–south line, thereby establishing the southern boundary of lot 5. This would fulfill the intent of the original platters, *i.e.,* to place the southern boundary at the point where the eastern–most point on the meander line strikes the north–south line.

Wicks argue that this method reduced the acreage of lot 5 as it is designated on the plat and is thus inferior to the method proposed by their expert, Berg. Furthermore, they contend that Berg's method, placing the boundary at a point which would produce the same acreage in each lot as designated on the plat, is required by the case of *Thein v. Burrows, supra.* This reliance upon *Thein* is misplaced.

In *Thein,* the land sought to be located had been conveyed originally by an *acreage* description: "the South 10 acres of the North 20 acres of Government Lot 4." The property was bounded by the Wishkah River, the bed of which had undoubtedly shifted. The issue was whether to draw the boundary line perpendicular to the old meander line or to a new one reflecting the current course of the river. The court held that the old line should be used. In the course of its decision, the court said:

> The general rule governing the determination of boundary lines by resurvey is that the intent of the new survey should be to ascertain where the original surveyors placed the boundaries rather than to determine where

---

[2]The governmental system for numbering lots requires that they be numbered in sequence. Thus, boundaries for lot 5 would be determined before those for lot 6. *See* F. Clark, *Law of Surveying and Boundaries* § 192 *et seq.* (3d ed. 1959).

new and modern surveys would place them. *Staaf v. Bilder,* 68 Wn.2d 800, 803, 415 P.2d 650 (1966).

*Thein v. Burrows, supra* at 763. This statement supports the contention of the respondents that lot 5 should be closed at a point as near as possible to that shown on the original government survey and which represents the intent of the original platters.

The opinion in *Thein* goes on to note that it is a case where parcels of land have been conveyed *in terms of acreage alone.* The court then noted that this problem will seldom arise because there are typically other aids available to assist in the location of the correct boundaries. However, in the case before them, the only way a boundary could be located was by a computation of acreage.

▆ Defendants cite no cases in which government survey lines have been redrawn by a court to achieve acreage designations shown on the official plat. The general rule is that, while it may be considered, the designated quantity of land called for is the least reliable of all descriptive particulars and the last to be resorted to. *W.B. Thompson & Co. v. McNair,* 199 La. 918, 7 So. 2d 184 (1942); *Texas Pac. Coal & Oil Co. v. Masterson,* 160 Tex. 548, 334 S.W.2d 436 (1960); *Lopez v. Smith,* 145 So. 2d 509 (Fla. Dist. Ct. App. 1962); 1 *Patton on Land Titles* § 155, at 410 (2d ed. 1957). This rule is recognized in 12 Am. Jur. 2d *Boundaries* § 75, at 612, which further states:

> [W]hen a specified tract of land is sold, the entire tract ordinarily passes, although it exceeds the quantity mentioned in the deed. This is especially true where the land is represented to contain a certain number of acres "more or less."

This last phrase is precisely that which was used in the sale of these lots. They were originally conveyed by lot designation with acreage qualified as "more or less," and due to the discrepancy between the platting and the surveying of the meander line, they actually contained areas at variance with those called for by the plat. The discrepancy had to be

resolved by a court of law, which court had a choice of methods.

Because we find no legal impediment to the method used by the witness Thornton and adopted by the court to resolve the problem created by the platting of lots 5 and 6, and because there is substantial evidence to support the trial court's factual finding that the original government survey intended to close lot 5 where the meander line was thought to strike the eastern boundary of lot 5, we affirm the action of the trial court on this issue.

## ADVERSE POSSESSION

The Wicks also claim title by virtue of adverse possession basing their claim on the provisions of both RCW 7.28.070 and 7.28.080.[3]

 The defendants had the burden of proof to establish title by adverse possession. *Brown v. Hubbard,* 42 Wn.2d 867, 259 P.2d 391 (1953); *Jackson v. Pennington,* 11 Wn.

---

[3]RCW 7.28.070 states:

"Adverse possession under claim and color of title—Payment of taxes. Every person in actual, open and notorious possession of lands or tenements under claim and color of title, made in good faith, and who shall for seven successive years continue in possession, and shall also during said time pay all taxes legally assessed on such lands or tenements, shall be held and adjudged to be the legal owner of said lands or tenements, to the extent and according to the purport of his or her paper title. All persons holding under such possession, by purchase, devise or descent, before said seven years shall have expired, and who shall continue such possession and continue to pay the taxes as aforesaid, so as to complete the possession and payment of taxes for the term aforesaid, shall be entitled to the benefit of this section."

RCW 7.28.080 states:

"Color of title to vacant and unoccupied land. Every person having color of title made in good faith to vacant and unoccupied land, who shall pay all taxes legally assessed thereon for seven successive years, he or she shall be deemed and adjudged to be the legal owner of said vacant and unoccupied land to the extent and according to the purport of his or her paper title. All persons holding under such taxpayer, by purchase, devise or descent, before said seven years shall have expired, and who shall continue to pay the taxes as aforesaid, so as to complete the payment of said taxes for the term aforesaid, shall be entitled to the benefit of this section: *Provided, however,* If any person having a better paper title to said vacant and unoccupied land shall, during the said term of seven years, pay the taxes as assessed on said land for any one or more years of said term of seven

App. 638, 525 P.2d 822 (1974). In finding of fact No. 12, the court specifically found

> That the defendants failed to meet their burden of proving that they had actual, open and notorious possession of the property in dispute herein under claim and color of title, made in good faith. Nor have the same said defendants sustained their burden of showing that they for seven successive years continued in possession and during said time paid all taxes legally assessed thereon.

Such a finding will not be disturbed on review if supported by substantial evidence. *Jackson v. Pennington, supra.*

With respect to the matter of good faith on the part of the Wicks, the record shows that shortly after acquiring their portion of lot 5, the senior Wicks went to the office of the Pierce County Assessor where they saw the maps suggesting that they did not own all of the property claimed. They were advised by their then attorney, Mr. Copeland, that perhaps a quiet title action would be necessary and it was thereafter that they conveyed to their son by a metes and bounds description the land which is now claimed. At all relevant times Mrs. Wick had some skill in matters concerning real estate and essentially she devised the description. The court was entitled to infer that the purpose was to obtain a tax segregation to aid in gaining title by paying taxes for the statutory period. The evidence further reflects that Bryan Wick was 19 years old at the time of the original conveyance to him, and although he denied knowledge of the title infirmity as of the time when the deed was delivered, the court was not obliged to believe him. The oral opinion of the trial judge makes it clear that he suspected the good faith of all of the Wicks. In assessing the good faith of the parties, the court said:

> Now, I have already said that I felt that both sides were a little bit opportunistic. The Court is unwilling to accept the proposition that the Wicks, who obviously were knowledgeable, obviously not only did their own

---

years, then and in that case such taxpayer, his heirs or assigns, shall not be entitled to the benefit of this section."

research but had Copeland doing lots of research on it, they knew there was a problem, and I find it hard to believe that their subsequent conduct wasn't, not necessarily dictated by the problem, but that the problem wasn't always there and that it didn't have some effect on the way they handled subsequent things.

There being a failure of proof on the element of good faith, the Wicks claim necessarily must fail under both sections of the statute.

A further deficiency exists. The trial court found that upon segregation of lot 5 for tax purposes, pursuant to the deed from the senior Wicks to Bryan Wick, he started paying taxes on the land so segregated. The evidence is that the taxes on the balance of lot 5 were proportionately reduced. No corresponding reduction occurred for the taxes assessed on lot 6. The trial court found in finding of fact No. 11:

> That the defendants were aware of the question concerning the southern boundary line of their property, which question remained unresolved. That either both plaintiffs and defendants paid taxes on the property in dispute, or the defendants paid no taxes thereon since they received no interest in Government Lot 6 as defined herein.

■ Where by mistake of the assessor, double assessments are made upon a single parcel of land and the true owner pays the taxes, he cannot be dispossessed under the 7–year statute by the other taxpayer because the taxes which that other taxpayer was paying were not "legally assessed" as required by the 7–year statute. *Grays Harbor Commercial Co. v. McCulloch,* 113 Wash. 203, 193 P. 709 (1920); *Turner v. Ladd,* 42 Wash. 274, 84 P. 866 (1906).

Because the taxes paid by Bryan Wick were paid on land judicially determined to have been part of lot 6, and because the true owner of the relevant portion of lot 6 has always paid the taxes legally assessed thereon, the taxes paid by Bryan Wick must be deemed to have been a double assessment levied through assessor's error and thus were

not "legally assessed." This constitutes failure of proof as to an additional element required by both statutes.

Because two essential elements of the defendants' claim were absent, we find it unnecessary to resolve the questions of the alleged vacancy of the land and the sufficiency of the acts of dominion which defendants characterize as actual, open and notorious, it being enough to note that the trial court found against the defendants on both points under disputed facts.

The judgment of the trial court is affirmed.

PEARSON, C.J., and REED, J., concur.