IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ANDREW SEITZ, CONNIE SEITZ NELSON, and KIMBERLY BROCKMANN, | ) ) ) ) |
| Appellants, | ) ) |
| v. | ) ) |
| RONALD KNUTZEN and MARILYN KNUTZEN, individually and the marital community comprised thereof, PAM NELSON FAMILY TRUST, MORGAN BARTLETT, JR., and LAURIE BARTLETT, individually and the marital community comprised thereof; and SKAGIT COUNTY, a political subdivision, | ) ) ) ) ) ) ) ) ) ) ) |
| Respondents. | ) ) ) |

No. 77255-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 8, 2019

SMITH, J. — Andrew Seitz, Connie Seitz Nelson, and Kimberly Brockmann (collectively the Seitzes) own a tideland property on the north end of Padilla Bay. This appeal concerns the location of the boundary between the Seitzes' tideland property and the beachfront (or upland) properties of their neighbors, Ronald (now deceased) and Marilyn Knutzen and Morgan and Laurie Bartlett. The Seitzes argue that the location of that boundary was forever fixed by a decree entered in Nauman v. Holmes, No. 13,653 (Skagit County Super. Ct., Wash. December 18, 1931). We hold that the Nauman decree determined only the boundaries between adjacent tideland properties in Padilla Bay. It did not determine the boundaries between those tideland properties and their adjoining upland properties. Therefore, we affirm.

BACKGROUND

*The Nauman Case*

In 1931, Benjamin Nauman, the trustee for approximately 95 percent of the tidelands in Padilla Bay, filed a quiet title action against other owners of Padilla Bay tidelands. In his complaint, Nauman alleged that "prior to the date of filing this complaint, the State of Washington sold and conveyed a major portion of Padilla Bay tide lands of the second class." He explained that the deeds from the State conveying these second-class tidelands to private owners described them only with reference to the government meander line[1] and "did not define and/or undertake to define by course or distance the side lines and/or the outer lines of the said tidelands so conveyed." In other words, the deeds from the State did not provide enough information to define the boundaries of each parcel of tideland as it extended seaward into the Padilla Bay mudflats.[2] Furthermore, because the tidelands were situated in an irregular cove along Padilla Bay,

> it is not possible for two or more of said tide land owners to agree
> and they cannot agree upon the division and boundary side lines or

---

[1] "Meander lines" are "straight-line segments, run by surveyors, that approximately follow the sinuosities of the edge of a body of water." 18 WILLIAM B. STOEBUCK & JOHN A. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 13.5, at 99 (2d ed. 2004). They are used in surveying because "it would be difficult, if not practically impossible, for a surveyor to measure and describe the irregular edge of a body of water." 18 STOEBUCK & WEAVER § 13.5, at 99. Meander lines are fixed and determinable, i.e., once defined, they can be reestablished on the ground by any competent surveyor. Vavrek v. Parks, 6 Wn. App. 684, 688, 495 P.2d 1051 (1972).

[2] Other litigation from around the same time suggests that Nauman's lawsuit was motivated by his plans to develop an oyster-growing industry on these mudflats. See Doohan v. Nauman, 172 Wash. 372, 372-73, 20 P.2d 37 (1933) (explaining, in litigation involving "seven chains of tide lands in Padilla Bay," that "[i]n June, 1930, Nauman planned to develop an oyster-growing industry on the lands").

the establishment thereof between their respective tracts because of the necessary converging lines by reason of the irregular curvature of the shore of said cove or bay and the difficulty in reaching the line of extreme low tide by straight and parallel lines . . . and also because for two or more parties to so agree would leave undetermined and in dispute the boundary line between such parties and the next adjoining owner of such tideland and that the determination of one side of the boundary line of any particular parcel of said tideland necessarily involves the determination of the outer limit and opposite and other side of said part or parcel of tideland.

Nauman alleged that "the above stated condition has and will result in disputes between owners of said tidelands as to the true location of the boundary lines of the several and numerous tracts of said tidelands." Therefore, he asked the court to appoint "one or more . . . competent surveyors or engineers as commissioners to survey, erect, establish and properly mark said boundaries, and return to the court a plat of said survey and the field notes thereof together with their report." He also asked that once the commissioners completed their report,

a hearing be had and a decree entered herein fixing, determining and forever establishing the boundary lines of said tide lands in this complaint referred to and by the parties hereto respectively claimed and owned, and that judgment be entered forever establishing the boundary lines and title of the plaintiff and defendants respectively to said tide lands by them respectively owned.

Nauman had obtained a title report on the above described tidelands, and his complaint described each tideland property together with its owners, encumbrancers, and "all others therein interested." Nauman's complaint named as defendants not only the individuals he identified as having an interest in the tidelands (other than those for which Nauman was trustee), but also "all other persons or parties unknown claiming any right, title, estate, lien or interest in the

3

real estate described in the complaint."

Nauman's counsel attempted to serve each of the identified defendants but believed that some of them were either nonresidents or could not be found in the state. Accordingly, Nauman requested, and the court granted, an order directing service by publication on named defendants and "upon all other persons or parties unknown, claiming any right, title, estate, lien or interest in the real estate described in the complaint." Service was made by publication in accordance with that order.

The court appointed Edward C. Dohm as commissioner "to establish by meets [sic] and bounds descriptions the boundary lines between the respective tracts of tide lands of the second class owned by the parties plaintiff and defendants to this action, and return to this court a map or plat showing such establishment and report thereon." Commissioner Dohm began his work on April 15, 1931, and on November 30, 1931, he filed a "Map of Padilla Bay" and made an oral report to the court. This was followed by a written report, filed on December 16, 1931. In his written report, Commissioner Dohm described the area embraced by the project, explained how he defined the exterior limits of the land under consideration, and described the methodology he used "for segregating the individual tracts and to establish the boundary lines of same."

As shown on the Map of Padilla Bay and described in Commissioner Dohm's report, Commissioner Dohm segregated the Padilla Bay tidelands into 846 distinct tracts. The tracts are arranged sequentially from tract 1 through tract 846 in radial fashion, like adjoining leaves of a folding fan whose pivot is located

4

at a control point established by Commissioner Dohm in Padilla Bay, near Hat Island.

The court adopted and ratified Commissioner Dohm's report and the Map of Padilla Bay and "decreed that the boundary lines of the said several parcels or tracts of Padilla Bay tide lands of the second class, as therein established, fixed and determined, shall be and hereby are decreed to be the boundary lines of said respective tracts of tide lands." The court also declared null and void "all other maps or plats of Padilla Bay affecting the tide lands of the second class" and deemed those maps "wholly superseded" by Commissioner Dohm's map.

### The Seitzes' Lawsuit

The Seitzes own tracts 60 through 70 of the above described Map of Padilla Bay (Seitz Tideland Property). The Bartletts and the Knutzens each own upland properties located on Samish Island and abutting the Seitz Tideland Property to the north. It is undisputed that title to the Bartletts' upland property (Bartlett Property) and the Knutzens' upland property (Knutzen Property) was originally patented to a private owner by the United States in 1882, before Washington became a state. It is also undisputed that title to the Seitz Tideland Property was originally acquired from the State of Washington, post statehood.

In 2014, the Seitzes, who believed that the Knutzens and the Bartletts were encroaching on the Seitz Tideland Property, filed suit to determine the boundary between the Seitz Tideland Property and the Knutzens' and Bartletts' respective upland properties. The Seitzes also named as a defendant the Pam Nelson Family Trust (Nelson Trust), which owns an upland property to the east of

the Knutzen Property.[3] The Seitzes argued that the _Nauman_ decree forever fixed the boundary between the Seitz Tideland Property and its adjoining upland properties at the government meander line, which is depicted on the Map of Padilla Bay. The Bartletts and the Knutzens moved for summary judgment and the Nelson Trust joined, arguing that the _Nauman_ decree had no bearing on the boundary between their properties and the Seitz Tideland Property. They argued instead that the boundary between these properties is, in accordance with Washington's general rule for upland properties patented before statehood, the government meander line _or_ the line of mean high tide, _whichever is farther seaward._

The trial court agreed with the upland property owners, summarily dismissed the Seitzes' claims, and entered a judgment and decree quieting title in favor of the upland property owners. The Seitzes appeal that judgment solely as it relates to the Knutzens and the Bartletts (referred to hereinafter collectively as respondents).

## ANALYSIS

### _Effect of the Nauman Decree_

The Seitzes argue that the trial court erred by concluding that the _Nauman_

---

[3] The Seitzes also named Skagit County as a defendant, but their claims against Skagit County were later dismissed. Although the Seitzes designated the order dismissing Skagit County in their notice of appeal, the Seitzes' opening brief neither assigns error to that order nor provides argument with regard to that order. Therefore, we deem the Seitzes' appeal of that order abandoned. RAP 10.3(a)(4), (5); see also Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 845, 347 P.3d 487 (2015) (appellate court will not consider claim of error not supported with legal argument in opening brief).

decree had no bearing on the boundary between the Seitz Tideland Property and its adjoining upland properties and by establishing that boundary at the farther seaward of the meander line and the line of mean high tide. We disagree.

As an initial matter, the material facts are not in dispute here. The only issue before the court is what effect, if any, the Nauman decree had on the location of the boundary at issue. The trial court's interpretation of the Nauman decree and its summary resolution of this dispute in accordance with that interpretation are issues of law that we review de novo. See In re Marriage of Thompson, 97 Wn. App. 873, 877, 988 P.2d 499 (1999) (interpretation of decree is question of law reviewed de novo); Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015) (order granting summary judgment reviewed de novo).

The general rule in Washington with respect to the boundary between an upland property and its adjoining tideland property is that "the upland owner owns down to the line of mean high tide." 18 STOEBUCK & WEAVER § 13.5, at 100. But there is a long established exception to this rule that applies where, as here, title to the upland property was originally patented to a private owner by the United States. "In such cases, 'a land patent conveys to the patentee title to all of the property above the line of ordinary high tide or the government meander line, *whichever is farther seaward.*'" Larson v. Nelson, 118 Wn. App. 797, 805-06, 77 P.3d 671 (2003) (quoting Stockwell v. Gibbons, 58 Wn.2d 391, 393-94, 363 P.2d 111 (1961)); see also Van Siclen v. Muir, 46 Wash. 38, 40, 89 P. 188 (1907) ("In grants made prior to the adoption of the constitution, [the line of ordinary high water] marks the boundary only where the navigable water has not

7

been meandered by the government, or the meander line runs above the line of ordinary high water; where the meander line runs below that line, the meander line itself marks the boundary of the grant to the upland owner."). In other words, under the general rule applicable to uplands patented before statehood, the boundary between the Seitz Tideland Property and the respondents' respective upland properties is the farther seaward of the line of ordinary high tide or the government meander line. The Seitzes concede that, absent Nauman, this rule applies. But they argue that the Nauman decree forever fixed the boundary at the meander line, notwithstanding this general rule. For the following reasons, the Seitzes' reliance on Nauman is misplaced.

First, the Nauman decree, by its express terms, affected solely "the *tide lands of the second class* lying [alongside] of and adjacent to . . . Padilla Bay," title to which traced back to the State. (Emphasis added.) At the time, "second class tide-lands" was statutorily defined as "public lands *belonging to the state* over which the tide ebbs and flows outside of and more than two miles from the corporate limits of any city, *from the line of ordinary high tide to the line of extreme low tide*." REM. REV. STAT. § 7797-6 (emphasis added). Furthermore, the State of Washington had, at statehood, disclaimed any interest in tidelands that had previously been patented by the United States. WASH. CONST. art. 17, § 2. In other words, the Nauman decree, by its terms, did not affect any property lying landward of the line of ordinary high tide or any property patented to a private owner before statehood—including the property that now constitutes the Bartlett Property and the Knutzen Property.

8

Second, when construing a decree, this court "seek[s] to ascertain the intention of the court entering the decree in light of the record before the court at that time." Hill v. Hill, 3 Wn. App. 783, 786, 477 P.2d 931 (1970), overruled on other grounds by Stokes v. Polley, 145 Wn.2d 341, 37 P.3d 1211 (2001). When read in conjunction with Nauman's complaint and Commissioner Dohm's report, it is clear that the Nauman court intended only to apportion ownership of the Padilla Bay tidelands among their several owners and did not intend to fix any upland boundaries. For example, in the Nauman complaint, Nauman described the problem he was trying to solve solely in terms of the relationship of tideland tracts *to one another*. He explained that it was "not possible for *two or more of said tide land owners to agree* . . . upon the division and boundary side lines . . . *between their respective tracts*." (Emphasis added.) He also explained that the goal of the litigation was to resolve potential disputes *between* owners of the tidelands in Padilla Bay. To that end, the only persons made party to the Nauman action were those who had an interest in the *second-class tidelands* described in the complaint. Upland owners were not even within the scope of the title report that Nauman used to identify potential parties, which was limited to identifying "the record title of the various parts and parcels *of said second class tidelands*." (Emphasis added.)

Furthermore, in its written findings, the Nauman court explained that the scope of Commissioner Dohm's assignment was to establish "the boundary lines *between* the respective tracts of tide lands of the second class owned by the parties plaintiff and defendants to this action." (Emphasis added.) And in his

report, Commissioner Dohm explained that after being commissioned, he "proceeded . . . with the survey and platting of the tide lands of Padilla Bay for the purposes of establishing the boundary lines *of the several ownerships thereof.*" (Emphasis added.) In adopting Commissioner Dohm's Map of Padilla Bay, the Nauman court decreed that "the boundary lines of the said several parcels or tracts of Padilla Bay tide lands of the second class, as therein established, fixed and determined, shall be and hereby are decreed to be the boundary lines of said *respective* tracts of tide lands." (Emphasis added.) In other words, the Nauman decree adopted the Map of Padilla Bay to fix and determine the boundary lines of the tideland tracts *respectively*, i.e., in relation to one another. Finally, the Nauman decree states that it is binding only on the parties to the suit and their heirs, "and on all other persons or parties unknown, claiming any right, title, estate, lien or interest *in and to the tide lands described in the complaint.*" (Emphasis added.) As discussed, the tidelands "described in the complaint" were second-class tidelands, which by definition excluded what now constitutes the Bartlett Property and the Knutzen Property. In short, it is clear from the record that the Nauman court's intent was to establish the boundaries *between* respective tideland parcels—not to determine the boundary between those parcels and their adjoining upland properties.

As a final matter, and although the meander line is in fact depicted on the Map of Padilla Bay, it is well established that meander lines generally "are not intended as boundaries of . . . upland tracts." Harris v. Swart Mortg. Co., 41 Wn.2d 354, 361, 249 P.2d 403 (1952); see also BLACK'S LAW DICTIONARY 1128

10

(10th ed. 2014) (emphasis added) (defining "meander line" as "[a] survey line *(not a boundary line)* on a portion of land, usu. following the course of a river or stream."). Rather, meander lines "were run by the United States government for the purpose of fixing the acreage within the government lot so that a price could be set." Thomas v. Nelson, 35 Wn. App. 868, 870, 670 P.2d 682 (1983). Thus, when a legal description contains a call to a meander line, the presumption is that the meander line is *not* a boundary line. 18 STOEBUCK & WEAVER § 13.5, at 102.

This presumption can be overcome by clear evidence of intent to establish the meander line as a boundary line. Harris, 41 Wn.2d at 361. To this end, the Seitzes argue, relying on Harris and on Erickson v. Wick, 22 Wn. App. 433, 591 P.2d 804 (1979), that the Nauman decree overcame the presumption here. But Harris and Erickson are not persuasive. Harris involved a deed in which the metes and bounds description of the property conveyed expressly described a part of the boundary as "'*following [the] meander line* North forty (40) degrees west, nine hundred ninety (990) feet; *thence continuing in said meander line* North Fifty-five (55) degrees West, four hundred eighty-five (485) feet.'" Harris, 41 Wn.2d at 357 (emphasis added). And in Erickson, the court was required to determine the intent of the original grantor because the meander line as drawn on a plat and the meander line as located by survey were in two different places, and this discrepancy resulted in the failure of a lot to close. Erickson, 22 Wn. App. at 434-35. By contrast, the dispute between the Seitzes and the respondents involves neither an express call to the meander line in a deed nor a

11

discrepancy resulting in an unclosed lot.

Furthermore, "evidence of . . . intent must be strong to overcome the usual presumption" that the meander line is *not* intended as a boundary. 18 STOEBUCK & WEAVER § 13.5, at 102; see also Myers v. Harris, 10 Wn. App. 706, 707, 519 P.2d 1307 (1974) ("Washington law is throughly settled that a deed which employs a meander line . . . as one of the calls in the description conveys to the water, unless there exist clear and convincing indications that the meander line is intended to be the actual boundary."). That quantum of evidence is absent here because, as discussed, the Nauman decree was not intended to establish the tideland/upland boundary at all—much less to fix that boundary at the meander line. Harris and Erickson do not require reversal.

The Seitzes next contend that the Nauman judgment was more "all-encompassing" than the respondents imply and that it was not limited to determining the boundaries between respective tideland tracts. They point out that Commissioner Dohm's report "is full of references to the meander line"; that the meander line was "the basis for all of his calculations"; and that Commissioner Dohm specifically referred to the meander line when calculating the length of certain tracts. But the fact that Commissioner Dohm referred to the meander line and used it for his calculations does not mean that the meander line was intended as the tideland/upland boundary. Rather, it simply means that Commissioner Dohm used the meander line for its intended purpose: "to allow mathematical computation of parcels of land" where "it would be difficult, if not practically impossible, for a surveyor to measure . . . the irregular edge of a body

12

of water." 18 STOEBUCK & WEAVER § 13.5, at 99; see also Vavrek, 6 Wn. App. at 688 (The "primary role [of meander lines] is somewhat historical, to ascertain the acreage enclosed in the original grant of land. They do not ordinarily designate the boundary of the land granted.").

The Seitzes also rely on references to the "exterior limits" of the tidelands to argue that the Nauman judgment determined not only the side boundaries between each tideland tract, but also their boundaries with adjoining upland properties. But Commissioner Dohm's report indicates that the exterior limits established therein are the reference lines needed, in addition to the government meander line on the landward side of Padilla Bay, to define the overall extent of the tidelands under consideration. The report also indicates that the purpose of establishing these exterior limits was to provide a mathematical basis for apportioning the tidelands at issue and to designate the boundary between the Padilla Bay tidelands and the adjoining "non"-Padilla Bay tidelands to the northwest and southwest. There is no indication that by establishing these exterior limits, the Commissioner—or the court in adopting the Commissioner's report—intended to establish the meander line as the tideland/upland boundary.

The Seitzes next assert that on the Map of Padilla Bay, "[t]he meander lines have the appearance of outer boundary lines of the tideland lots." The Seitzes refer to two excerpts from the Map of Padilla Bay attached as an appendix to their opening brief, but these excerpts do not support their assertion. Rather, the excerpts reflect nothing more than that the meander line is shown as a dashed line, consistent with the map's reference key, which also shows the

meander line as a dashed line. The Seitzes also refer to a survey prepared by Northwest Datum & Design. But for the reasons discussed, this survey is incorrect inasmuch as it designates the meander line as the landward boundary of the Seitz Tideland Property. Furthermore, this conclusory survey was commissioned by the Seitzes themselves to show alleged encroachments onto their property. Thus, like the Seitzes' excerpts from the Map of Padilla Bay, the survey is not persuasive here.

The Seitzes next argue that the respondents' respective predecessors in interest were in fact joined as parties to and served in Nauman. Specifically, the Seitzes point out that although the Nauman complaint did not name specific upland lot owners, it included as defendants "all other persons or parties unknown claiming any right, title, estate, lien or interest in the real estate described in the complaint herein." They then contend that upland owners were among the "all other persons" described in the complaint and later served by publication. But the only "other persons" implicated by the complaint and served by publication were those with an interest *in the real estate described in the complaint*. Again, that real estate consisted solely of second-class tidelands. And as discussed, those tidelands excluded, by definition, what now constitutes the Bartlett Property and the Knutzen Property. Therefore, the Seitzes' argument that the respondents' predecessors were parties to Nauman is unpersuasive. And because the Nauman decree did not reach the respondents' predecessors or their upland properties, the Seitzes' arguments that the respondents must vacate that decree are also unpersuasive.

14

Indeed, these and the Seitzes' other arguments ignore the undisputed fact that title to all tidelands involved in Nauman traced back to the State of Washington, and it is axiomatic that the State could not have conveyed to *any* tideland owner more than what it owned. Harkins v. Del Pozzi, 50 Wn.2d 237, 310 P.2d 532 (1957), is instructive on this point. That case also involved a boundary dispute between an upland owner whose title originated with a prestatehood patent, and an owner of second-class tidelands originally acquired from the State. Harkins, 50 Wn.2d at 238-39. There, as here, the upland property owner claimed ownership out to the line of ordinary high tide, which was farther seaward than the meander line at the relevant location. Harkins, 50 Wn.2d at 239. In explaining that the tideland owner's only claim to the land between the meander line and the line of ordinary high tide was by adverse possession, the Washington State Supreme Court stated, "The conveyance from the state of Washington of second-class tidelands . . . to respondent's predecessor *conveyed only the title which the state had, namely, to the line of ordinary high tide.*" Harkins, 50 Wn.2d at 240-41 (emphasis added). Here, as in Harkins, neither the Seitzes' predecessors nor any other tideland owners who were parties to Nauman could have acquired any more than the State had to convey—i.e., tidelands extending landward to the line of ordinary high tide or the meander line, whichever is farther seaward. Cf. Larson, 118 Wn. App. at 805-06 (federal land patent conveys title to the father seaward of the line of ordinary high tide and the government meander line); WASH. CONST. art. XVII, § 2 (disclaiming state ownership in lands patented by the United States).

15

As a final matter, the Seitzes argue that because Skagit County was named in the <u>Nauman</u> lawsuit and because Skagit County was once an owner of a part of the Knutzen Property consisting of an abandoned alleyway, the Knutzens, at least, are bound by <u>Nauman</u>. The record does not reflect why Skagit County was named.[4] But, the county clearly was not named due to any interest in the alleyway because, again, the entire Knutzen Property was the subject of a prestatehood patent and was outside the scope of <u>Nauman</u>. Therefore, this argument is without merit.

The <u>Nauman</u> decree has no bearing on the boundary dispute at issue here. And because the parties agree that Washington's general rules apply absent <u>Nauman</u>, the trial court did not err by summarily establishing the boundary between the Seitz Tideland Property and the respondents' respective upland properties at the farther seaward of the line of ordinary high tide and the meander line.

*Costs and Attorney Fees Below and on Appeal*

The Seitzes assign error to the trial court's award of statutory attorney fees and costs in favor of the respondents, but provide no argument or authority in support of that assignment of error. Therefore, we decline to consider it. <u>See</u> RAP 10.3(a)(6) (brief should contain argument in support of issues presented for review, together with citations to authority); <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (holding that appellant waived

---

[4] The obvious reason for naming Skagit County, even though it was not identified as an owner of any tideland properties, is that Skagit County likely had tax liens on at least some of the properties at issue.

assignment of error by failing to present argument in support thereof).

Additionally, the respondents request fees and costs on appeal under RAP 14.2. That request should be directed to the commissioner or court clerk pursuant to RAP 14.2, which provides: "A commissioner or clerk of the appellate court will award costs to the party that substantially prevails on review, unless the appellate court directs otherwise in its decision terminating review."

We affirm.

WE CONCUR: