*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1261**

Michael L. Pogreba,
Respondent,

vs.

Lorraine Pogreba, et al.,
Defendants,

Janet Bowen, et al.,
Appellants.

**Filed May 20, 2024
Affirmed
Bratvold, Judge**

Todd County District Court
File No. 77-CV-21-343

Scott T. Johnston, Brit D. Brouillard, Johnston Law Office, P.A., Alexandria, Minnesota (for respondent)

Christina C. Hopke, David J. Meyers, Rinke Noonan, Ltd., St. Cloud, Minnesota (for appellants)

Considered and decided by Smith, Tracy M., Presiding Judge; Connolly, Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

Respondent sued to determine the boundary line dividing two adjacent parcels, one of which has lakeshore. Respondent owns the lake parcel, while he and his siblings own

the adjacent farm parcel. Their dispute was tried to the district court without a jury. Appellants challenge the district court's judgment granting relief to respondent and amending and correcting the legal descriptions of both parcels. Appellants argue that the district court erred in (1) determining that the relevant deed is ambiguous; (2) considering extrinsic evidence and adopting a legal description for respondent's parcel that includes 29 acres, instead of 16 acres as stated in respondent's existing deed; and (3) considering the meander line from an 1858 government survey of the disputed land as relevant extrinsic evidence for locating the boundary between the two parcels. Because the district court did not err in determining that the relevant deed is ambiguous, the record evidence supports the district court's findings of fact, and the district court's decision otherwise accords with binding and persuasive legal authority, we affirm.

**FACTS**

This case involves two parcels of land in Todd County, one of which is adjacent to Thunder Lake. The district court and the parties refer to appellants' property as the "farm parcel" and to respondent's property as the "lake parcel." We will also use these references for the disputed properties.

*The Parties, the 1858 Government Survey, and the Relevant Deeds*

Respondent Michael Pogreba owns the lake parcel. Respondent's mother, defendant Lorraine Pogreba, has a life estate in the farm parcel. In 2003, Lorraine and Robert Pogreba transferred the remainder interest in the farm parcel to their adult children: respondent, defendant David Pogreba, and appellants Tami Altrichter, Colette Anderson, Janet Bowen,

2

Lisa Engen, and James Pogreba.[1] Robert has since passed away. In 2014, respondent, appellants, and David conveyed an option to purchase the farm parcel to James and his spouse, appellant Marilyn Pogreba.

The United States government once owned both parcels and, in 1858, conducted the only survey of the parcels that predates this litigation. The 1858 government survey is known as the Government Land Office Survey or the "GLO map." The relevant GLO map shows the lake parcel as part of "Government Lot 1" and the farm parcel as part of "Government Lots 1 and 2." Government Lot 1's eastern border is the shoreline of Thunder Lake, which is depicted by a "meander line." Caselaw explains that a meander line is a surveyor's line drawn "for the purpose of defining the sinuosities of the bank of a lake or stream." *Great N. Ry. Co. v. City of St. Paul*, 63 N.W. 96, 98 (Minn. 1895).

The parcels were transferred several times by deed, and the deeds describe the parcels, in part, by using the terms "Lot 1" and "Lot 2." It is undisputed that these refer to Government Lots 1 and 2 as depicted in the GLO map. The federal government transferred the entirety of Government Lots 1 and 2 to the Northern Pacific Railroad Company in 1897. The district court found that, in 1903, the Northern Pacific Railroad Company transferred "all of the land relevant to this dispute"—the farm and lake parcels—to Albert Malok's parents, who later transferred both parcels to Malok, plus a quarter section that is not involved here. The 1903 deed described the parcel by referring to Government Lots 1 and 2 and recited "168.12 acres more or less."

---

[1] Because many parties to this appeal have the same last name, we use first names for clarity. We also note that Lorraine and David Pogreba are not parties to this appeal.

In 1932, Malok mortgaged the farm parcel and the quarter section in favor of his parents. The district court determined that the legal description in the 1932 mortgage "is ambiguous because it was identical to the prior description" in the 1903 deed, "save for the fact that the [mortgage] instrument recited that the land had 152.12 acres, more or less, rather than the 168.12 acres" in the 1903 deed. The district court inferred that Malok "intended to remove 16 acres from the purview of the mortgage, even though the mortgage did not itself state which 16 acres were excepted." (Emphasis omitted).

In 1933, Malok divided his property by transferring the lake parcel. Malok conveyed 16 acres to Steve Wieshalla; Malok retained the farm parcel plus the quarter section. The 1933 deed described the lake parcel:

> The east sixteen (16) acres of Lot One (1) in Section Thirty-One (31) in Township One hundred thirty-one (131) north of Range thirty-two (32) West

(1933 deed or lake-parcel deed).

Malok lost the farm parcel and the quarter section in 1936 in a mortgage foreclosure. After the foreclosure but also in 1936, Frank Wieshalla—Steve Wieshalla's brother—and his wife purchased the farm parcel and the quarter section. The 1936 deed described the farm parcel as Government Lots 1 and 2 "except the east 16 acres" and said it contained 152.12 acres "more or less."

4

In 1939, the farm parcel and quarter section were divided. Frank Wieshalla and his wife kept the quarter section and transferred the farm parcel to their niece, Steve's daughter Mabel Goligowski. The 1939 deed described the farm parcel:

> Southeast quarter of the northwest quarter and Lot One and Two of section thirty-one (31) *except the East sixteen (16) acres* of Lot One (1) section thirty-one all in One hundred thirty-one (131) north of Range Thirty-two (32) west, containing one hundred twelve and twelve hundredths acre (112.12), be the same more or less

(1939 deed or farm-parcel deed). (Emphasis added.)

Both the lake and farm parcels were transferred several more times. As mentioned above, Robert and Lorraine Pogreba purchased the farm parcel in 1965 and, in 2015, they conveyed the farm parcel to their children—including respondent and appellants—reserving a life estate for themselves. As for the lake parcel, Mark Rasmussen purchased it in 2001. In 2019, Rasmussen transferred the lake parcel to respondent.

*The Jahner Survey*

After the 1858 government survey, no owner surveyed the disputed property until respondent obtained the lake parcel. Respondent wanted to log the property, so he hired a surveyor, Mark Jahner, to determine the boundary lines of the lake parcel.

Jahner, who is also the Todd County Surveyor, testified that he "look[ed] at all the deeds and compar[ed] the acres" and found that "if you add the adjoining acres and this 16 acres" conveyed by the 1933 deed, "they add up to the acres shown [in] the government land survey exactly to the 100th." Based on the 1933 and 1939 deeds and the 1858 government survey, Jahner testified that the lake parcel's boundary lines should be

5

determined based on the acres as depicted in the 1858 GLO map. Although Jahner did not use a shorthand reference for the acres depicted in a GLO map, one of appellants' experts testified that the GLO map depicted "nominal" acres. The same appellants' expert also testified that nominal acres depicted in the GLO map differ from actual acres on the ground, and that the nominal acres depicted in a GLO map do not "limit" the actual acres that a deed grants by its legal description. Jahner also agreed that, "most of the time," the actual number of acres found in the field is different from what is shown on the GLO map, and when he surveyed the lake parcel, he found more acres than the 1933 and 1939 deeds granted.

In Jahner's opinion, the 16 nominal acres recited in the 1933 deed should be located based on the boundary dividing the farm and lake parcel, and this boundary is ascertained by using the meander line shown on the GLO map. Jahner testified that the location of the 16 acres referenced in the 1933 deed should not be determined by using either the actual or historic shoreline of Thunder Lake. Jahner acknowledged that he does not recall ever before using a meander line in a property survey.

The district court summarized Jahner's testimony about how he conducted the survey to determine the boundary of the lake parcel. Jahner "first reconstructed the original meander lines by locating section corner monuments and consulting the original field notes from the original government survey." Jahner determined the "calls" with "minimal error" and used "standard techniques" to "compensate" for the error. Jahner "then located a western boundary line for the lake parcel by finding a line parallel to the eastern section line, such that the lake parcel would contain 16 acres above the meander lines on the

6

original government survey."[2] Jahner "ran this line straight from the section line, in the north, down to the lake, in the south."

After establishing the boundary between the lake and farm parcels, Jahner's survey showed two lots for the lake parcel: one is 15 acres and located above the meander line, and one is 14 acres, located below the meander line and adjacent to the lake. Jahner prepared "updated legal descriptions" for the lake and farm parcels. Based on Jahner's survey, respondent's corrected legal description of the lake parcel has 29 actual acres.

*This Litigation*

On April 12, 2021, respondent sued his mother, his siblings—including appellants—as well as the State of Minnesota acting through the Minnesota Department of National Resources (DNR) and "all other persons unknown claiming any right, title, estate interest, or lien in the real estate described in the complaint." In the complaint, respondent described land he had acquired. Based on his description, respondent requested judgment (1) determining the boundaries of the lake and farm parcels and correcting the legal descriptions, (2) determining the boundary line that divides the land owned by respondent from the land owned by respondent and appellants, (3) declaring respondent the fee simple

---

[2] The district court explained the terms "above" and "below" the meander line. "Below" is the land between the meander line and the actual shoreline. "Above" refers to the nominal acres depicted by the meander line on the GLO map. The district court also explained that Jahner was applying "the parallel-line rule," which applies when a parcel of land is described based on acres within a portion of a larger lot; under this rule, the boundary is typically determined by finding a line that runs parallel to a fixed boundary on that portion of the larger lot. *McDonald v. Denson*, 199 S.W.2d 707, 708 (Tex. Civ. App. 1947); *Koons v. Burkhart*, 119 N.E. 820, 821 (Ind. App. 1918); *Gress Lumber Co. v. Coody*, 21 S.E. 217, 217-18 (Ga. 1894); *Johnson v. Ashland Lumber Co.*, 2 N.W. 552, 554 (Wis. 1879).

owner of the lake parcel as corrected, (4) determining that appellants do not have any "right, title, estate, interest or lien" in the lake parcel, (5) ordering that the proper legal description for the lake and farm parcels is as respondent describes, and (6) directing a surveyor to set up judicial landmarks for the boundary lines.

During the bench trial on December 15 and 16 of 2022, the district court heard testimony from respondent, some appellants, others who lived on the disputed parcels in the past, and experts on land surveying. Jahner's testimony is summarized above. Witnesses who had lived on the farm or lake parcels described their understanding—or lack thereof—of the lake-parcel border based on landmarks such as the logging road, the gravel pit, the sledding hill, concrete footings, and the old and new driveway to the lake parcel.

Appellants' expert witnesses, Dennis Pederson, Scott Marlin, and Samuel DeLeo, disagreed with Jahner's survey determinations, but none of them surveyed the lake parcel. Pederson testified that there was no basis for determining the western boundary of the lake parcel using the meander line and that the 1933 deed to the lake parcel should not be interpreted to convey more than 16 acres. Marlin gave similar testimony and described the meander line as having "no relevance." DeLeo emphasized that a meander line is not a boundary and is no longer relevant after the property is privately owned.

All three of appellants' surveyors testified that they would use the ordinary high-water mark of the shoreline to determine the 16 acres described in the 1933 and 1939 deeds and that they would not rely on historic aerial photographs in determining the high-water mark. Both Pederson and Marlin also testified that they would ask the DNR to

define the ordinary high-water mark. Pederson acknowledged that the owners who transferred the farm and lake parcels in the 1930s would not have known the ordinary high-water mark that he is describing.

Appellants also introduced testimony from Tyler Pogreba, a licensed surveyor and son of appellant James Pogreba. Tyler was not called as an expert. Like the appellants' experts, Tyler did not survey the disputed parcels, but he prepared illustrative exhibits based on testimony from witnesses about some landmarks. Tyler also prepared three estimates of the ordinary high-water mark of the Thunder Lake shoreline based on aerial photography from 1939, 1963, and 2020.

The district court issued an order and memorandum with findings of fact and conclusions of law on April 27, 2023. The district court granted respondent's requested relief establishing the boundary line between the lake and farm parcels and correcting the deeds. The district court noted that the 1933 deed for the lake parcel "described it only as the 'east sixteen' acres of Government Lot 1, without any other lines or landmarks referenced." The first step, therefore, was "how to locate the 'east sixteen' acres," which the parties agreed included Thunder Lake as the eastern boundary with the western boundary to be "chosen." The parties disagreed, however, on the second step: how to measure the 16 acres. Respondent argued that the 16 acres were the nominal acres depicted in the GLO map and located based on the meander line. Appellants argued that the 16 acres were actual acres measured from the ordinary high-water mark of Thunder Lake.

The district court determined that the "original deed for '16 acres' is . . . ambiguous as to what kind of acres were meant to be measured." The district court explained that

9

"[n]either the number '16' nor the word 'acres' is ambiguous standing alone, but the subject to which those words should be applied is ambiguous on the face of the deed." (Emphasis omitted.) The district court concluded that it could consider extrinsic evidence to determine the intent of the parties conveying the parcels. The district court then examined "the original instruments, the circumstances of the transactions, the owners' accounts of the boundary, and other public records" to determine the original parties' intent for the western boundary line of the lake parcel. Based on the extrinsic evidence, the district court determined that the "16 acres" in the 1933 and 1939 deeds for the lake and farm parcels refer to nominal acres above the meander line as shown in the GLO map. In short, the district court accepted respondent's reasoning, adopted the Jahner survey, and corrected the descriptions for the lake and farm parcels.

Appellants moved to reconsider and for amended findings, which the district court denied with one exception by order on August 6, 2023.[3] This appeal follows.

## DECISION

In an appeal after a bench trial, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01. The Minnesota Supreme Court has explained our review for clear

---

[3] The district court's order stated that it "withdraws Part I.b of the memorandum accompanying its April 27, 2023 Order for Judgment as being unnecessary in light of [appellants'] clarified positions." In short, the district court withdrew its legal analysis of the latent ambiguity in the relevant deeds and "replaced" it with appellants' "concession that the lake parcel deed contains a latent ambiguity."

10

error. An appellate court examines the record to see "[i]f there is reasonable evidence in the record to support the [district] court's findings," and in doing so, the appellate court views "the evidence in the light most favorable" to the district court's decision. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (quotation omitted). To conclude that the district court's "[f]indings of fact . . . are clearly erroneous," the appellate court "must be left with the definite and firm conviction that a mistake has been made." *Id*. (quotations omitted). Still, appellate courts review de novo the district court's interpretation of the language in a deed. *Marine Credit Union v. Detlefson-Delano*, 830 N.W.2d 859, 866 (Minn. 2013). "[W]hether a written instrument is ambiguous is a question of law subject to de novo review." *Mollico v. Mollico*, 628 N.W.2d 637, 641 (Minn. App. 2001) (determining that a deed's language is unambiguous).

Respondent seeks to resolve a boundary dispute with appellants. A district court may grant relief when

> [a]n action [is] brought by any person owning land or any interest therein against the owner, or persons interested in adjoining land, to have the boundary lines established; and when the boundary lines of two or more tracts depend upon any common point, line, or landmark, an action may be brought by the owner or any person interested in any of such tracts, against the owners or persons interested in the other tracts, to have all the boundary lines established.

Minn. Stat. § 559.23 (2022). Briefly stated, this statute allows a landowner to settle controversies with an adjoining landowner about boundary lines that depend on a common point. *Id.* Under this statute, a district court establishes *present* boundary lines, not merely the location of the original government boundary line separating disputed properties.

*Stadin v. Helin*, 79 N.W. 537, 537-38 (Minn. 1899) (interpreting a previous version of the statute).

Appellants raise three issues: (1) whether the district court legally erred in determining that the lake deed is ambiguous and may be interpreted using extrinsic evidence, (2) whether the district court's factual findings are clearly erroneous, and (3) whether the district court's decision is contrary to Minnesota law. Because the third issue relates to the first issue, we have combined those issues and discuss them together.

## I. The 1933 deed for the lake parcel is ambiguous.

We interpret contracts and deeds using the same rules. *See Romanchuk v. Plotkin*, 9 N.W.2d 421, 426 (Minn. 1943) (stating that "[r]ules of construction are mere aids in ascertaining the meanings of writings whether they are statues, contracts, deeds, or mortgages"). Our goal is "to ascertain and give effect to the intention of the parties." *Dittrich v. Ubl*, 13 N.W.2d 384, 390 (Minn. 1944). A deed "not only fix[es] the rights of the immediate parties, but affect[s] those of every one who subsequently acquires an interest in [the] land." *La Cook Farm Land Co. v. N. Lumber Co.*, 200 N.W. 801, 802 (Minn. 1924). Thus, appellate courts recognize that it is "of the highest importance that the legal effect of a deed should not be a matter of doubt." *Id.*

To interpret a deed, we first determine whether a deed's language is ambiguous. *See Mollico*, 628 N.W.2d at 640. If a deed's language is unambiguous, then we interpret the language as written. *See id.* at 641. A writing is ambiguous if "it is reasonably susceptible to more than one interpretation." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). If a deed's language is ambiguous, a court may

consider extrinsic evidence to determine the intent of the parties who entered into the deed. *State v. Hess*, 684 N.W.2d 414, 423 (Minn. 2004) (quiet-title action). Extrinsic evidence is "admissible to clarify ambiguous terms" in a written instrument, but not "to vary terms whose meaning is plain." *Hayle Floor Covering Inc. v. First Minn. Constr. Co.*, 253 N.W.2d 809, 812 (Minn. 1977); *see also Danielson v. Danielson*, 721 N.W.2d 335, 338 (Minn. App. 2006) ("[W]hen parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." (quotation omitted)). In other words, when extrinsic evidence is permitted, it may not be used to contradict the unambiguous text of the deed.

The district court noted some caselaw helpful to our interpretation of the relevant deed. First, original government surveys may be used to interpret a deed. When a deed refers to a lot created by an original government survey, the lines, descriptions, and landmarks contained in the survey are considered part of the deed. *Jefferis v. E. Omaha Land Co.*, 134 U.S. 178, 194-95 (1890); *Nicolin v. Schneiderhand*, 33 N.W. 33, 33 (Minn. 1887). Thus, because the 1933 deed to the lake parcel refers to Government Lot 1, which is in the GLO map, we conclude that the 1858 government survey is part of the 1933 deed.

Second, as discussed above, government surveys include meander lines to represent the shoreline of bodies of water. *Great N. Ry. Co.*, 63 N.W. at 98. Meander lines "are not boundary lines." *Id.* Instead, "the water, and not the meander line, constitutes the boundary

13

of the land." *Moscrip v. Webster Lumber Co.*, 204 N.W. 326, 328 (Minn. 1925).[4] Still, a meander line may be prima facie evidence of the location of a shoreline, although this presumption may be rebutted. *In re Cnty. Ditch No. 67*, 186 N.W. 711, 712 (Minn. 1922).[5]

Third, owners of parcels "abutting on the meander line" are deemed to "own the land between the meander line and the lake shore."[6] *Shea v. Cloquet Lumber Co.*, 100 N.W. 111, 111 (Minn. 1904) (citing *Sec. Land & Expl. Co. v. Burns*, 91 N.W. 304 (Minn. 1902)). Often, significant land exists between the meander line and the shoreline of a body of water, called an "overrun in acreage." *Johnson v. Rost*, 204 N.W. 642, 643 (Minn. 1925) (stating that "[u]sually there is an overrun in acreage to the advantage of the [original] purchaser" of a government lot); *see also Everson v. City of Waseca*, 46 N.W. 405, 405 (Minn. 1890)

---

[4] If a property description designates a boundary other than the water line, however, the designated boundary is the proper boundary rather than a body of water. *See Gridley v. Lenroot (In re Gridley)*, 126 N.W. 897, 898 (Minn. 1910).

[5] Courts also have used meander lines to equitably apportion lands omitted from the government survey or lands subject to relictions or accretions of bodies of water or to determine rights to lake beds. *See United States v. Pappas*, 814 F.2d 1342, 1344 (9th Cir. 1987) (omitted lands); *State v. Adams*, 89 N.W.2d 661, 687 n.18 (Minn. 1957) (lake beds); *Hanson v. Rice*, 92 N.W. 982, 983 (Minn. 1903) (relictions and accretions). Neither party sought equitable apportionment here.

[6] The district court also noted that "the owner of land bordering a non-navigable body of water in Minnesota has conditional title all the way to the center of the lake," quoting *Adams*, 89 N.W.2d at 687 n.18. The district court posited that Thunder Lake may have been navigable at one time but is now non-navigable. And the district court observed that neither party offered evidence about the location of the center of the lake or "about where lines drawn between that point and points to the original government meander lines would be," which "are generally used to determine how to apportion relictions created by lowering of lake levels over time." The district court stated that it did not consider the center point of Thunder Lake when determining the disputed boundary lines. Neither party challenges this on appeal.

(determining that a purchaser of land acquired title to "several acres of dry land between [a meander line] and the shore").

With these principles of law in mind, we consider the 1933 deed for the lake parcel. We note that the parties agree that the 1933 deed is the relevant deed because it divided the larger parcel to create the lake parcel. Also, the 1939 deed describes the farm parcel based on the lake parcel by noting that the farm parcel does not include "the East sixteen (16) acres" of Government Lot 1.

The 1933 deed described the lake parcel as the "East sixteen (16) acres of Lot One (1)." Appellants argue in their brief to this court that the 1933 deed is unambiguous.[7] The district court summarized appellants' position as arguing that "the original parties necessarily intended to convey 16 acres of the actual upland portion of the parcel" with the actual shoreline of the lake as the eastern boundary. Respondent argues that the deed is

---

[7] While appellants argue in their brief to this court that the district court erred by determining that 1933 deed was ambiguous, appellants' position on the deed's language is unclear. Appellants acknowledged in their memorandum in support of their motion for amended findings "that there is a latent ambiguity when the deed is applied on the ground," conceding that the deed is ambiguous. Similarly, in appellants' brief to this court, they noted that "[c]ertain of the expert surveyors classified" the deed as having "a latent ambiguity" because it was ambiguous "how the deed applies on the ground." Appellants' expert witnesses testified that the deed was ambiguous on the ground. This reference to "on the ground" ambiguity—latent ambiguity—is not a meaningful distinction. Under Minnesota caselaw, the "old distinction between patent and latent ambiguity, [was] never more than an unprofitable subtlety . . . [and] may be wholly disregarded." *Wilmot v. Minneapolis Auto. Trade Ass'n*, 210 N.W. 861, 861-62 (Minn. 1926). We accordingly do not address appellants' attempt to distinguish between latent and patent ambiguity in the 1933 deed. While we continue our de novo legal analysis of the 1933 deed, we consider appellants, at the very least, to have conceded that the 1933 deed may be ambiguous.

ambiguous for the same reason the district court found it ambiguous: the deed does not show the "subject" or "proper reference" to locate the 16 acres conveyed.

We agree with respondent that the 1933 deed does not refer to a landmark for determining where the 16 acres are located. While the lake parcel is described as "east" in Government Lot 1, and this lot has Thunder Lake as its eastern boundary, no other point of reference is included for the northern, western, or southern boundary. With this in mind, we examine two reasonable interpretations of the 1933 deed.

First, the 1933 deed suggests that the original parties intended to convey 16 actual acres of Government Lot 1 bounded on the east by the shoreline or high-water mark of Thunder Lake. Tyler Pogreba testified about this interpretation at trial and drew an illustrative trial exhibit based on historic aerial photos. The appellants' three expert surveyors offered testimony giving a similar interpretation, although they would not use historic aerial photos to determine the high-water mark of Thunder Lake. Tyler's illustrative map, exhibit 122, shows an approximation of where appellants asserted the 16 acres are located.



Second, the 1933 deed suggests that the original parties intended to convey 16 nominal acres for which the meander line on the GLO map is used to determine the western boundary. Jahner testified about this interpretation at trial and used this interpretation to conduct a survey, which was received as a trial exhibit. According to caselaw, Jahner's interpretation means that the purchaser of the lake parcel not only acquired 16 nominal acres above the meander line, but also acquired the acreage between the meander line and the shoreline. *See Shea*, 100 N.W. at 111 (stating that the "general rule" is that owners of a lot abutting a meander line "own the land between the meander line and the lake shore"). The relevant portion of Jahner's survey, exhibit 4, shows where respondent asserted the 16 acres are located.



Appellants contend that the second interpretation is not reasonable because caselaw precludes interpreting a deed to convey nominal acres. Appellants rely on a nonprecedential opinion of this court. We note that nonprecedential opinions are not binding on this court but may be persuasive. Minn. R. Civ. App. P. 136.01, subd. 1(c); *Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn. App. 1993) (stating that nonprecedential opinions by the court of appeals are not binding but "can be of persuasive value").

18

In *Hess v. Neyens*, we considered a boundary dispute that arose after Hess purchased a portion of Neyens's farm. No. C6-95-2324, 1996 WL 438798, at *1-2 (Minn. App. Aug. 6, 1996). Hess's deed described the parcel as "'Government Lots Five (5), Six (6) and Seven (7) and the Southeast Quarter of the Southwest Quarter (SE ¼ or SW ¼)' in section two. This description ended with the phrase 'consisting of 167 acres, more or less.'" *Id.* The parties disputed whether the acres between the lakeshore and the meander line were conveyed by Hess's deed. *Id.* at *2. Hess sought to reform the deed to 167 acres west of the meander line, claiming that he would also own the 43.2 meandered acres to the shoreline or receive damages. *Id.* The district court first rejected Hess's reformation claim on summary judgment and, after a trial, entered judgment for Neyens on the damages claim. *Id.* We affirmed after concluding that the deed conveyed "approximately 167 acres, 43.2 of which are so-called meandered acres." *Id.*

We do not find *Hess* persuasive for the same reasons the district court rejected it, though the district court noted a "superficial similarity" between Hess's case and this case. First, the 1933 deed refers to 16 acres, which is a material difference from Hess's case. As the district court explained, "this case involves the division of a government lot in terms of acreage alone," while *Hess* "involved the conveyance of whole lots by fully-defined borders, by a sale in gross" of 167 acres more or less. Second, as the district court stated, "this case involves a dispute about the meaning of a written instrument from long ago," while *Hess* "was a dispute about whether a recent written instrument contradicted the known intentions of its drafters."

19

This second point is significant because *Hess* did not involve an unambiguous deed, as appellants imply. Our opinion in *Hess* identified six pieces of extrinsic evidence that supported the district court's conclusion that Hess's deed conveyed meandered acres. *Id.* From this, we infer that Hess's deed was ambiguous, although the opinion does not state it directly.

Appellants ask us to rely on *Hess* to conclude that a deed may *not* be interpreted to refer to nominal acres from an original government survey. It is true that this court commented that Hess did not cite any "authority for the proposition that the acres mentioned in his deed must be 'deeded' acres," and accordingly, we saw "no lawful basis to attribute to a reference to 'acres' a construction that regards only 'deeded' acres." *Id.* We will assume that Hess's reference to 167 "deeded" acres is to 167 "nominal" acres as depicted in the original government survey. But we conclude that this court in *Hess* declined to consider nominal acres from the original government survey based on the district court's decision to rely on extrinsic evidence. Accordingly, *Hess* does not support appellants' claim that a deed may not be interpreted to refer to nominal acres; *Hess* shows only that extrinsic evidence in that case did not support that particular finding.

Appellants also contend that the second interpretation is not reasonable because it uses meander lines. To be clear, the second interpretation does not use the meander line as a boundary. *See Shea*, 100 N.W. at 111 (citing *Kirwan v. Murphy*, 83 F. 275 (8th Cir. 1897)) (summarizing caselaw as stating that "the meander line run by the government surveyors was not a boundary line and that title of the owners of abutting property extended to the lake shore"). The second interpretation uses the meander line as a reference point to

locate the boundary between the lake and farm parcels and thus to locate the sixteen acres of Government Lot 1 conveyed by the 1933 deed. The district court relied on two decisions from foreign jurisdictions that have upheld a district court's decision to use meander lines when interpreting a deed.

In *Thein v. Burrows*, Thien owned the "South 10 acres of the North 20 acres of Government Lot 4." 537 P.2d 1064, 1065 (Wash. Ct. App. 1975). Jones owned the "other parcel of land in question [which was located] immediately south" of Thein's parcel and contracted with Burrows to remove timber from his parcel. *Id.* Both parcels abutted a river on the east. *Id.* Like the lake parcel here, the parcels in *Thein* were described "only in terms of acreage." *Id.* at 1066. Thein contended that Burrows was cutting timber on his parcel, and the parties offered competing surveys that disagreed about whether to use a new meander line or the meander line from the 1859 original government survey to determine the boundary between their properties. *Id.* at 1065. The district court granted judgment to Burrows after accepting the survey with the new meander line. *Id*.

The Washington Court of Appeals reversed the judgment. *Id*. at 1067. The court of appeals first noted that meander lines are not meant to serve as boundary lines and that, "in most cases, the boundary is deemed to run to the watercourse itself." *Id.* at 1066. But the appellate court continued: "[I]t does not necessarily follow . . . that original government meander lines may not, or cannot be used as an aid in determining the location of a boundary line perpendicular to the meander line." *Id.* In fact, the appellate court described the meander line as "the only available, credible evidence of the location of the perpendicular line which will produce the north 20 acres of the Government Lot." *Id.* And

21

the appellate court finally concluded that, "in a case such as this, where the parcels of land have been conveyed in terms of acreage alone since the original government survey, . . . the original government meander line *must* be used in determining the appropriate boundary lines." *Id.* at 1067 (emphasis added).

Appellants argue that *Thein* is not persuasive because it was "limited to its narrow holding by *Erickson v. Wick*, 591 P.2d 804 (Wash. [Ct.] App. 1979)." In *Erickson*, the Washington Court of Appeals stated that *Thein*'s analysis about the relevance of meander lines applies when "parcels of land have been conveyed *in terms of acreage alone*." *Id*. at 807 (emphasis added). The appellate court determined that *Thein* did not help it understand the facts before it because *Erickson* involved redrawing government survey lines "by [the] court to achieve acreage designations shown on the official plat." *Id.* We agree with the district court that "*Erickson* did not overrule *Thein*, it simply noted that *Thein* applies to very particular circumstances." In fact, "*Erickson* helps to show that the result in *Thein* was due to the uncommon facts of *Thein*," and here, "the uncommon facts are similar." Accordingly, the district court properly considered *Thein* to be persuasive authority that a meander line may be used to interpret the location of acreage on a deed.

Persuasive authority from the Michigan Supreme Court also indicates that a meander line may be used to interpret a deed. *Peck v. Webb* involved a property that abutted a lake on one side. 88 N.W. 888, 889 (Mich. 1902). The deed for the disputed property included the parties' agreement to divide some property "equally" between them and referenced a specific number of acres. *Id.* After realizing that Webb claimed half the meandered acres, Peck sought to declare that his deed measured acres "to the water's edge."

22

*Id*. The Michigan Supreme Court affirmed the district court's decision entering judgment for Webb after determining that, since "the conveyance was made with reference to the land inside of the meander lines," the land should have been divided based on the meander line and not the shoreline. *Id*.[8]

Appellants argue that "*Peck* and its facts are not analogous to the facts at issue here and the district court's reliance on *Peck* is misplaced because" there is no evidence that the parties here intended for the meander line to be the boundary. As the district court pointed out, *Peck* shows that "the language of the deeds in both cases was not unambiguous." We agree that *Peck* illustrates that a deed may either refer to the shoreline as a boundary or contemplate use of the meander line to determine the boundary. While the extrinsic evidence of the parties' intent in *Peck* differs from the extrinsic evidence of the parties' intent here, that difference in evidence does not diminish the persuasiveness of *Peck*'s analysis.

Like the Michigan Supreme Court in *Peck*, we conclude that the 1933 deed conveying the lake parcel may be reasonably interpreted to convey 16 acres either with reference to the shoreline of Thunder Lake or using the meander line from the original government survey to determine the boundary between the lake and farm parcel. Thus, the

---

[8] The district court cited *Johnson*, pointing out that "at least one court in Minnesota has echoed the sentiment that a reference to acres does not itself define the line to be used in determining which acres are meant to count." 204 N.W. at 643 (determining that a deed conveying "one acre of land on the point extending to [a lake]" was void because the point referenced "was not definitely fixed, whether on the meander line, or high water mark, or low water mark").

1933 deed is ambiguous, and the district court properly considered extrinsic evidence to determine the intent of the original parties to the 1933 deed. *See Hess*, 684 N.W.2d at 423.

**II.     The district court's factual findings are supported by the record evidence**.

We next consider appellants' argument that the district court erred in finding that the original parties to the 1933 deed intended to convey the 16 acres based on nominal acres and the meander line in the 1858 original government survey. The district court considered extrinsic evidence to reach four main findings, which we consider in turn.

First, the district court reviewed the description of the lake parcel in the chain of title transfers and the description of the farm parcel and quarter section that Malok mortgaged in 1932 and which was foreclosed in 1936. The 1932 mortgage and the 1936 notice of sale by foreclosure both describe the farm parcel and quarter section as 152.12 acres, which was 16 acres less than previous deeds that described 168.12 acres, even though the lake parcel was transferred to Steve Wieshalla in 1933.

The district court noted that, if the deed is interpreted as describing nominal acres, the "sources of title are perfectly consistent." "But if the acreages were not meant to be the nominal acres, then further explanation [was] required" because there either must be "a good reason for reading . . . the 1932 mortgage or the 1933 deed as embracing more than the named acres" or "the instruments [are] inconsistent with each other and so create[] a gap between the parcels." Interpreting related deeds to create "gaps" is disfavored. *See Cannon v. Emmons*, 46 N.W. 356, 358 (Minn. 1890) (noting that "it would hardly be reasonable to suppose that the grantor . . . intended to leave a strip south of the land granted so narrow as to be useless"). The district court determined that this evidence showed that

24

the original parties intended for the 1933 deed to refer to 16 nominal acres as shown in the GLO map.

Second, the district court assessed the "circumstances of the 1933 conveyance" of the lake parcel. At the time of that conveyance, the GLO map "was the only known survey of the area," and the lake parcel was "relatively large and wooded at the time, and it is bordered by a shoreline that is not particularly simple"; therefore, it would have been difficult "for private parties in 1933 to calculate the area of the land by reference to the actual conditions on the ground." The district court accordingly determined that it was likely that the original parties intended for the 1933 deed to be based on the GLO map and nominal acres, especially given that the 1933 deed transferred the lake parcel during the Great Depression and surveys are expensive.

Third, the district court looked at the location of the lake parcel "relative to the township road now known as Leisure Drive." If the shoreline was far from the meander line in 1933, "then calculating 16 acres according to the actual amount of upland would have resulted in a gap between the parcel and the access road," while "calculating 16 acres above the meander line results in the lake parcel having road access in the area of the driveway which is used now."

Fourth, the district court looked at the "reputation of the border" between the lake and farm parcels through testimony from individuals who previously lived on the lake and farm parcels and who remembered an "old logging road" that they believed was the western border of the lake parcel. The district court noted the testimony of one prior resident of the farm parcel as "particularly credible" in identifying the logging road as the border because

25

he was "not an interested party in this litigation and his information comes from the original owner of the lake parcel."

The district court determined that while "accounts of the border varied in their details, they all share the feature that they are close enough to the [respondent's] proposed boundary line to be consistent with it"; however, "even the furthest east of these reputed lines is too far to the west to be consistent with any of [appellants'] proposed boundary lines." In denying appellants' motion to amend and to reconsider, the district court stated that the "more important" evidence was "the reputation of the location of the boundary," which "did not appear to be reconcilable with any interpretation of the deed, save for the interpretation advanced" by respondent.

In short, the district court determined that "[a]ll of these sources of evidence" suggested "that the original intent of the parties was to draw a boundary line that is correctly captured by the methodology" proposed by respondent and that the boundary line between the lake and farm parcel should thus be determined by reference to the meander line.

Appellants make three primary arguments about the district court's findings regarding the original parties' intent in conveying the lake parcel in the 1933 deed based on the extrinsic evidence. First, appellants contend that the district court erred by considering testimony about the boundary's reputation and the 1932 mortgage. But appellants cite no legal authority other than the parol-evidence rule for their assertion that this is error. We discern no error in light of the ambiguity of the deed's language. The district court weighed evidence about the boundary's reputation and the 1932 mortgage to determine whether the original parties to the 1933 deed intended to refer to the nominal

acres laid out the in GLO map. Appellate courts "do not reweigh the evidence that was before the district court." *Landmark Cmty. Bank, N.A. v. Klingelhutz*, 927 N.W.2d 748, 755 (Minn. App. 2019). The district court also found testimony about the logging road to be credible, and we do not second-guess the credibility decisions of the district court. *See id.* (stating that appellate courts "defer to a district court's credibility determinations").

Second, appellants claim that the district court improperly speculated to "fill in gaps" to determine that 1932 mortgage suggested that the original parties intended for the 1933 deed to refer to nominal acres and the GLO map and that access via the township road suggested that the property line should be based in part on the meander line. Appellants' arguments about the district court "speculating" to "fill in gaps" are not convincing. The district court's findings about the 1932 mortgage, the 1936 notice of sale by foreclosure, the GLO map, the testimony about the border's reputation, and the township road were based on record evidence, and these findings are consistent with the language of the 1933 deed. The district court is entitled to draw reasonable inferences and to weigh the evidence. *See Landmark Cmty. Bank*, 927 N.W.2d at 755; *Groe v. Comm'r of Pub. Safety*, 615 N.W.2d 837, 842 n.2 (Minn. App. 2000) ("District courts may make reasonable inferences from the facts."), *rev. denied* (Minn. Sept. 13, 2000).

Third, appellants argue that the district court must have incorrectly assessed the extrinsic evidence because it determined that the lake parcel has 29 acres instead of 16 acres, which contradicts the acreage recited in the 1933 deed. Generally, a deed of a definite quantity of land conveys the quantity described. *See Larson v. Goettl*, 114 N.W. 840, 840 (Minn. 1908) (indicating that a "deed of a definite quantity of land . . . on a particular side

27

of a larger tract, which is duly described, conveys the full quantity named"). And extrinsic evidence is not used to contradict unambiguous language in a deed. *Hayle Floor Covering*, 253 N.W.2d at 812.

We conclude, however, that the district court's judgment does not contradict the 1933 deed conveying "16 acres" because the district court determined that the original parties intended to convey 16 nominal acres based on the GLO map. The lake parcel includes more than 16 actual acres because the "owners of lots abutting on the meander line" generally are held to own the land between the meander line and the lakeshore. *Shea*, 100 N.W. at 111. Accordingly, the district court properly determined that the 1933 deed conveyed 16 nominal acres located based on the meander line and the western boundary and that the lake parcel includes the meandered acres because it abuts the meander line.

Finally, appellants' brief to this court does not address the intent of the original parties to the 1933 deed. Instead, appellants request that we "remand with instructions to the district court to order a survey completed" of the lake parcel "to locate the 16 acres using the shoreline of Thunder Lake and establish judicial landmarks consistent therewith." This is like appellants' argument, as stated by the district court, that "the plain meaning of the 1933 deed requires locating the line which traces the shoreline as it *actually exists at the time a surveyor would go out onto the property once ordered to do so as part of this action*." (Emphasis added.) The district court rejected this reasoning because "it does not make sense that the meaning of a deed executed in 1933 would hinge on conditions on the ground at some point in 2023." The district court underscored that courts favor using the high- or low-water level rather than "the actual 'boots wet' waterline," that the "actual

28

waterline lacks intrinsic legal significance," and that "there is no evidence to suggest using the actual waterline would align the boundaries of the property with any other evidence of the original parties' expectations."

We also reject appellants' argument that the lake parcel should be determined by reference to the current shoreline. We interpret a deed to give effect to the "intention of the parties at the time the conveyance was made." *In re Application of Mareck*, 100 N.W.2d 758, 763 (Minn. 1960). The original parties to the 1933 deed could not have intended to refer to the current shoreline, given that shorelines vary over time. Also, courts prefer definite and permanent property lines. *See La Cook Farm Land Co.*, 200 N.W. at 802 (stating that it is of "highest importance that the legal effect of a deed should not be a matter of doubt"). No record evidence attaches significance to the shoreline and the intent of the original parties to the 1933 deed. The shoreline is not referenced in the 1933 deed or in any deed related to the lake parcel, nor is it referenced in the extrinsic evidence offered through the testimony of witnesses who lived on the lake and farm parcels.

Therefore, the 1933 deed is ambiguous, the district court's factual findings are supported by the record evidence and not clearly erroneous, and the extrinsic evidence supports the district court's determination that the disputed boundary between the lake and farm parcels should be determined based on the nominal acres and meander line in the GLO map.

**Affirmed.**